UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| JAMES H. GRASS | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Cause No.:  1:13-cv-00310-JMS-DML |
| | ) | |
| DAMAR SERVICES, INC. | ) | |
| | ) | |
| Defendant. | ) | |

**DEFENDANT'S MEMORANDUM
IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

**I.      INTRODUCTION**

"Anyone can do the manual labor, but someone must be responsible for overall operations . . . .," said the [Court].  James Grass ("Grass") was the sole person responsible for the overall operations of Damar Services, Inc.'s ("Damar") Maintenance Department.  Others could have fixed Damar's toilets, picked up trash, mowed, and repaired windows, kitchen equipment, and heating systems, but Grass – and Grass alone – was charged with overseeing that (and more).

Yet, after being in charge of the Maintenance Department for fourteen years, Grass now claims he was a non-exempt employee entitled to overtime, just like any other Maintenance worker.

Grass was not just another Maintenance worker.  He was a Facility Maintenance Director supervising a department that during the relevant three-year period had a dozen or more non-exempt employees.  He administered an operating budget of nearly $1,000,000.  He had overall responsibility for the maintenance and repair of fifteen buildings on an approximate forty-six-acre main campus, a Charter School, twenty-four group homes, and two ancillary office properties.  More than 1,000 developmentally and behaviorally challenged clients and hundreds

of employees relied upon his Department to maintain their home or work environment in a functional, safe, and comfortable manner.

With minimal oversight, Grass oversaw the day-to-day operations of the Maintenance Department, including: assigning and directing work; training; scheduling and approving overtime; and selecting and negotiating with vendors and contractors. His staffing responsibilities included interviewing and hiring, evaluating, disciplining, promoting and effecting pay increases for his subordinates. For these responsibilities, his gross pay was $62,142.16 in 2011 and $62,199.44 in 2012.[1]

In light of his substantial responsibilities, Damar properly classified and compensated Grass as an exempt executive.[2]

There is a dearth of case law involving plaintiffs who resemble Grass. Typically, managers claiming to be misclassified work in small operations such as a convenience or video store or in a small department. They are not highly-paid managers subject to minimal oversight while themselves exercising substantial oversight of a dozen or more employees providing services for hundreds of employees and clients and maintenance of forty-six-plus acres and forty buildings. There is a reason for this lack of similar cases: managers, like Grass, are properly classified as exempt.

Plaintiff's State law claims, which appear an afterthought, fail on their facts and the law.

---

[1]   At the end of 2012, his employment ended as a result of an investigation confirming he falsified a subordinate's time records and intimidated members of his staff who participated in the investigation.

[2]   Ironically, Grass lost his job for violating the same wage and hour law he now claims Damar violated in classifying him as exempt.

US.53871623.01

II.    **STATEMENT OF UNDISPUTED MATERIAL FACTS**

A.    **Background Facts And Grass' Employment**

1.    **Damar's Business Operations**

Damar, a not-for-profit agency, provides numerous programs for children and adults with developmental and behavioral challenges through varied community programs.  (Affidavit of Joseph E. Vandivier ("JEV Aff.") ¶ 3)[3]  Between 2010 and 2012, Damar served between 1,200 and 1,450 clients daily.  (Affidavit of Elizabeth A. Snyder ¶ 11)[4]  In 2010, 2011, and 2012, Damar's average number of employees was 823, 864, and 924 respectively.  (Snyder Aff. ¶ 11)

2.    **The Maintenance Department**

The Maintenance Department maintains all Damar buildings and much of the grounds. (JEV Aff. ¶ 3, Ex. A)  In 2012, that included almost 200,000 square feet in fifteen buildings on the main campus, a Charter School, four Medicare-licensed group homes, five State-licensed group homes, fifteen Transitional Service Line homes, and two ancillary office properties. (JEV Aff. Ex. A)The Maintenance Department's Operating Budget in fiscal years ending June 30, 2011, and June 30, 2012, was $935,768.00 and $922,671.00, respectively.  (Snyder Aff. ¶ 9)

Joe Vandivier, hired as a Maintenance employee on February 3, 1987, was promoted to Maintenance Director over all operations and safety in 1998; on January 1, 2012, Vandivier was promoted to Director of Operations and Safety with general oversight of maintenance and housekeeping and personal responsibility for safety, quality assurance, regulatory compliance, and accreditation.  (JEV Aff. ¶¶ 4, 5)  Vandivier's bi-weekly salary in 2012 was $2,904.47. (Snyder Aff. ¶ 4)

---

[3]    Affidavit of Joseph E. Vandivier is filed contemporaneously as Ex. 3 to Defendant's Evidence In Support Of Motion For Summary Judgment.  ("JEV Aff. ¶ __" or "JEV Aff. ¶ ___, Ex. ___")

[4]    Affidavit of Elizabeth A. Snyder is filed contemporaneously as Ex. 4 to Defendant's Evidence In Support Of Motion For Summary Judgment. ("Snyder Aff. ¶ __" or "Snyder Aff. ¶ ___, Ex. ___")

Throughout 2012, a total of sixteen hourly employees worked under Grass' direct or indirect supervision.  The highest paid under Grass' supervision was Michael Smith, who earned $22.50 per hour.  Smith, a Damar employee since September 25, 2000, has been highly compensated because of his exceptional expertise and skill in building and construction, specifically woodworking, and his vast knowledge of the Damar campus.  (Snyder Aff. ¶ 7)  He had been the Superintendent at Anderson Contracting, which constructed many of Damar's buildings during its 1990's expansion.  (Snyder Aff. ¶ 7, n.1)  Smith has saved Damar substantial sums in building furniture and other fixtures and assisting with overseeing construction projects.  (Snyder Aff. ¶ 7, n.1)  The next highest paid was Mikhail Malyovanny, who earned $19.86 per hour after twenty-one years of employment with merit pay increases and market adjustments; the lowest paid Maintenance employee earned $12.00 per hour; and the next lowest, Robert Alvey, who worked all of 2012, earned $12.24 per hour.  (Snyder Aff. ¶ 7)  The next two calculations exclude the trainee's $7.65 hourly rate.  (Snyder Aff. ¶ 7)  The average hourly pay for the fifteen Maintenance employees was $16.17; the median hourly rate was $16.32.  (Snyder Aff. ¶ 7) Grass' effective hourly rate would have been $28.64.  (Snyder Aff. ¶ 7)

Grass' gross pay in 2011 and 2012 was $62,142.16 and 62,199.44, respectively; in 2012, Smith grossed $35,066.12; Malyovanny grossed $46,159.65; and Alvey grossed $24,495.51. (Snyder Aff. ¶ 8)

### 3.   Grass' Employment

In June 1998, Vandivier hired Grass as Maintenance Supervisor.  (Deposition of James H. Grass (Grass Dep. 11:19-21[5]; JEV Aff. ¶ 6)  Vandivier hired Grass with the anticipation he would perform some hands-on work.  (JEV Aff. ¶ 8)  From the outset, though, Vandivier emphasized to Grass his expectation that Grass use his technical expertise and

---

[5]    Relevant excerpts of Grass' deposition and exhibits are filed contemporaneously as Ex. 1 to Defendant's Evidence In Support Of Motion For Summary Judgment (Grass Dep. ___ and Grass Dep. ____, Ex. ___).

experience to lead, train, and improve the skills of Damar's growing staff.

(JEV Dep. 47:22-49:13, 72:19-22 (Errata), Exs. 13, 14[6]; JEV Aff. ¶ 8)  Grass' responsibilities for

performance management are set forth, among other places, in the Maintenance Supervisor job

description that he signed on April 19, 2004.  (Grass Dep. 21:20-22:8, Ex. 3)

        Grass reported to Vandivier his entire employment.  (Grass Dep. 27:20-28:5)  Grass

signed a version of the Maintenance Supervisor job description on April 19, 2004.  (Grass

Dep. 21:20-22:8, Ex. 3)

        In August 2011, Grass requested a title change to Facility Maintenance Manager "due to

the fact that I have a ground manager, a garage manager and am requesting a campus

supervisor . . . supervisor does not cover my responsibilities."[7]  (JEV Aff. ¶ 9, Ex. B)  Grass was

subsequently promoted to Facility Maintenance Director in late 2011 or early 2012.  (Grass

Dep. 23:21-24:6; JEV Aff. ¶ 9)  Grass signed the Facility Maintenance Director Job Description

on January 10, 2012.  (Grass Dep. 25:13-19, Ex. 4)  While Grass' title changed, his duties did

not.  (Grass Dep. 23:21-24:2)  Grass remained responsible for the day-to-day operations of the

Maintenance Department, including the overall operation and appearance of Damar's residential

and other buildings, grounds, equipment, and vehicles.  (Grass Dep. 16:3-24, 22:19-26:16,

Exs. 3, 4)  Vandivier's confidence in Grass' leadership and managerial skills is reflected in all of

Grass' Annual Performance Appraisals.  (JEV Dep. 43:15-46:22, 47:22-49:13, Exs. 1-6, 8-17)

        Grass' office was located in Building No. 6 of the Maintenance Department.

(Grass Dep. 26:19-27:3)  No other members of Damar management had offices in the

Maintenance Department.  (Grass Dep. 27:2-19)  As of September 2008, Vandivier's office was

moved from the Maintenance Department to the Family Services Center, also known as the

---

[6]     Relevant excerpts of Vandivier's deposition and exhibits are filed contemporaneously as Exhibit 2 to
        Defendant's Evidence In Support Of Motion For Summary Judgment (JEV Dep. ___ and JEV Dep. ____,
        Ex. ___).

[7]     Grass then stated in his 2013 deposition that he spent approximately 65% of his time performing
        non-supervisory duties.  (Grass Dep. 149:3-17)

US.53871623.01

Administration Building, across campus, approximately 300 yards away from the Maintenance Department.  (Grass Dep. 28:6-22; JE  Aff. ¶ 7)  After Vandivier's office moved, Vandivier had minimal opportunities to physically observe Grass.  (JEV Dep. 45:18-46:15, 74:23-75:10, Ex. 3 (Damar 140); JEV Aff. ¶¶ 6, 7)  Grass saw Vandivier two or three times a week, typically in the parking lot or when Grass placed mail in Vandivier's mailbox at the Family Services Center.  (Grass Dep. 28:23-29:13; JEV Aff. ¶7)  Vandivier typically monitored Maintenance Department activity through weekly, monthly, and yearly reports Grass submitted and through conversations with Grass and other members of the Maintenance team.  (Grass Dep. 29:20-25)  In Grass' 2006-07 Appraisal, Vandivier noted that Grass "works well independently.  Requires very little supervision."  (JEV Dep. 47:22-49:13, Ex. 4 (Damar 145))  In Grass' 2010 Appraisal, Vandivier noted that Grass "stays in contact but very capable of handling any situation with no supervision."  (JEV Dep. 45:18-46:15, Ex. 3 (Damar 140))  Further, Vandivier testified in his deposition:

> Q.      Okay.  Did Jim, to the best of your recollection, also personally engage in the hands-on work?
>
> A.      Some, yeah.
>
> Q.      When you say "some," how much do you think he was doing?
>
> A.      I have no idea how much he was doing.
>
> Q.      Okay.  So, as far as the allocation of Jim's time –
>
> A.      Uh-huh.
>
> Q.      -- as a Supervisor, you don't know how much time he spent doing anything in particular?
>
> A.      No.

(JEV Dep. 74:23-75:10)

US.53871623.01

The Maintenance Department and Grass' regular hours were 7:00 a.m. to 3:30 p.m. Monday through Friday.  (Grass Dep. 32:12-14)  Grass recorded his hours worked by filling out a bi-weekly Salaried Time Sheet.  (Grass Dep. 32:23-33:15)  Other Maintenance employees recorded their time by electronic time clock.  (Grass Dep. 33:16-25; Snyder Aff. ¶ 6, Ex. C) Non-exempt Maintenance employees routinely worked some overtime.  (JEV Aff. ¶ 10)

With one exception,[8] from December 21, 2009 until Grass' employment ended on December 21, 2012, Damar paid him a bi-weekly salary of $2,291.  (Grass Dep. 31:7-32:7; Snyder Aff. ¶ 3, Ex. A)  During that three-year period, Grass never received less than his bi-weekly salary.  (Snyder Aff. Ex. A)  Damar did not deduct from Grass' salary for time off work or for any reason.  (Snyder Aff. Ex. A)

In December 2012, Damar placed Grass on administrative leave after receiving credible reports that he falsified the time records of one of his direct reports.  (Snyder Aff. ¶ 12)  During its subsequent investigation, Damar received credible reports that Grass engaged in intimidating and threatening conduct toward employees who participated in Damar's investigation.  (Snyder Aff. ¶ 12)  Grass admitted clocking one of his subordinates in and out for his regular shift despite the fact that the employee was not at work.  (Grass Dep. 171:12-25; Snyder Aff. ¶ 12)  Grass knew that he violated Damar's rules by manipulating the employee's time records. (Grass Dep. 172:15-21)

Damar's investigation confirmed both allegations of misconduct and Richard Harcourt, Senior Vice-President and Chief Financial Officer, and Elizabeth Snyder, Vice-President of Human Resources, decided to terminate Grass' employment.  (Snyder Aff. ¶ 13)  After presenting the conclusions of their investigation to Grass on December 21, 2012, Grass chose to resign.  (Grass Dep. 61:5-19, Ex. 9)  Upon his separation, Damar paid Grass all 264.57 hours of

---

[8]    Grass' first pay in that three-year period, for the pay period ending January 2, 2010, was at his former bi-weekly salary, $2,246.40.  (Snyder Aff. ¶ 3, Ex. A)

his earned unused PTO in the amount of $7,577.28 on the next regular pay day, January 3, 2013. (Snyder Aff. ¶ 14, Ex. A)

### B.      Grass' Duties As Supervisor / Facility Maintenance Director

During his tenure at Damar, Grass exercised actual and virtually sole authority over at least three significant aspects of the Department's operations: day-to-day work assignments, employee conduct and performance, and contractor/vendor relations.

### 1.      Grass' Day-To-Day Management Of The Maintenance Department

Grass' responsibilities included:  supervising maintenance staff; inspecting grounds, facilities and equipment routinely to determine necessary repairs and/or replacement; soliciting and analyzing bids from contractors for repairs, renovations and maintenance; planning, scheduling and coordinating general maintenance, major repairs and remodeling projects for entire facility; and seeking the best use of materials, equipment and staff to maximize efficiency and effectiveness.  (Grass Dep. 22:19-26:16, Exs. 3, 4)

At a minimum, Grass supervised between four and twelve employees during the relevant time period. (Grass Dep. 17:17-18:20) [9]  In 2012, the Maintenance Department employed a total of sixteen non-exempt employees.  (Snyder Aff. ¶ 7)  Grass distributed work orders to his employees.  (Grass Dep. 155:18-23)  Grass and the leads under his direction prioritized the maintenance jobs to be completed.  (Grass Dep. 180:12-25)

Grass reviewed his employees' time cards and made appropriate corrections to their reported time, including approving overtime.  (Grass Dep. 34:3-36:11)  Grass reviewed and approved all staff requests for personal time off.  (Grass Dep. 36:12-21)

---

[9]      Grass testified that he supervised approximately 12 employees in 2008 and 2009.  (Grass Dep. 17:17-18:20) He testified that in 2010 or 2011, the Maintenance Department was reorganized to install four leads under him and that each had Maintenance Department Employees who reported to them; those were Thomas Hill, grounds, Brent Smith, campus; Jeremiah Gastineau, garage lead mechanic, and Michael Smith, wood shop manager.  (Grass Dep. 18:1-19:15)  Until 2010 or 2011, everyone in the Maintenance Department reported directly to Grass.  (Grass Dep. 20:3-6)  Sometime in 2010 or 2011, at least four employees reported to him. (Grass Dep. 18:21-20:6)  Every Maintenance Department employee reported to Grass directly or indirectly. (Grass Dep. 21:5-14)

US.53871623.01

Grass communicated with Human Resources regarding personnel matters such as his staff's benefits, job descriptions, promotion, overtime, and the hiring process.  (Affidavit of Lisa Morgan ("Morgan Aff.") ¶ 4, Ex. A)[10]

2.   <strong><u>Grass' Management Of Staff's Work Load</u></strong>

Although the Maintenance Department regularly worked only day shift, Maintenance employees were routinely needed outside the regular shift because of emergency needs. (JEV Aff. ¶ 10)  Grass had the authority, without Vandivier's approval, to schedule employees for overtime needs and did so regularly.  (Grass Dep. 105:20-107:3; JEV Aff.  ¶ 10)  Grass also had authority to call outside service providers to respond to after-hours needs. (Grass Dep. 105:20-106:9; JEV Aff. ¶ 10)  Grass testified he spent 30 to 35% of his time doing managerial duties.[11]  (Grass Dep. 149:3-17)  Any time he spent doing non-managerial work was by his choice as he had staff and access to outside contractors upon whom to rely. (Grass Dep. 104:4-107:3; JEV Aff. ¶¶ 10-12)

While Grass was expected to be available 24/7 to respond to emergency situations, he had the authority to assign others to do the work and to be on call instead of him; he was not expected to do the work 24/7 himself.  (Grass Dep. 105:20-107:3; JEV Dep. 59:10-61:20; JEV Aff. ¶¶ 10-13)

Grass did not implement a formal on-call system to direct calls to his staff until November 8, 2010.  (JEV Aff. ¶ 16, Ex. F)  When Grass took a vacation, typically in June/July and October, he would take calls and respond to emails while on vacation.  (Grass Dep. 112:1-

---

[10]   Affidavit of Lisa Morgan is filed contemporaneously as Ex. 5 to Defendant's Evidence In Support Of Motion For Summary Judgment.  ("Morgan Aff. ¶ _" or "Morgan Aff. ¶ __, Ex. __")

[11]   Grass testified that on occasions when he did hands-on work, he performed tasks as varied as toilet repair, picking up trash, mowing, equipment and appliance repair, swimming pool maintenance and repair, vehicle maintenance and repair, and repairing windows, kitchen equipment, and heating and air conditioning.  (Grass Dep. 79:13-80:5; 161:11-24)

115:24, 116:1-25; JEV Dep. 67:9-15; JEV Aff. ¶¶ 13, 14; Morgan Aff. ¶ 6, Ex. A)[12]  Upon

return, he would ask Vandivier for additional pay for working on vacation.

(Grass Dep. 121:17-125:15; JEV Dep. 67:13-17; JEV Aff. ¶¶ 13, 15)  Sometimes Vandivier

would reduce the amount of PTO Grass used while on vacation.  (Grass Dep. 121:17-125:15;

JEV Aff. ¶ 15, Ex. D)

      Grass was scheduled for vacation beginning the afternoon of October 14, 2010, through

Sunday, October 22, 2010.  (JEV Aff. ¶ 14, Ex. C)  Grass sent an email to all Damar staff on

October 14, 2010, directing them to call him for emergencies after normal business hours and on

weekends.  (JEV Aff. ¶ 14, Ex. C)  Grass also noted he would be monitoring his email.

(JEV Aff. ¶ 14, Ex. C)

      When Grass returned from vacation on October 23, 2010, he asked for additional pay for

working on vacation.  (JEV Aff. ¶ 15)[13]  Vandivier and Harcourt promptly met with Grass to

discuss the continuing issue of his working on vacation and not assigning his staff on-call and

directed Grass to implement the on-call system for his staff (JEV Aff. ¶ 16), Grass did so via

email announcement on November 8, 2010.  (JEV Aff. ¶ 16, Ex. F)

      Grass had the authority to discipline on-call employees if they failed to respond when

on-call, and he counseled employees who failed to respond.  (Grass Dep. 104:4-25;

JEV Dep. 52:23-59:10, 75:11-76:6)  Grass also had the authority to hire a subcontractor or to call

another Maintenance Department employee (on overtime) to respond to emergency maintenance

calls.  (Grass Dep. 105:14-107:3; JEV Aff. ¶¶ 11, 12)

---

[12]    For example, Grass responded to a non-emergency email from Human Resources to all management and others
while he was on vacation, July 16, 2011.  (Morgan Aff. ¶ 6, Ex. A)
[13]    Vandivier agreed to count only three of Grass' six vacation days as PTO.  (JEV Aff. ¶ 15, Ex. D)

US.53871623.01

3.   **Grass' Role In Hiring, Promoting, Effecting Pay Changes, Evaluating,**
**And Disciplining**

Grass routinely made hiring, promotion, and pay raise recommendations and had the

authority to recommend discipline and discharge of his subordinates.  (Grass Dep. 39:18-40:3,

52:19-53:18, 104:11-105:13, 110:20-111:2; JEV Dep. 52:23-59:10, 75:11-76:6; JEV Aff. ¶ 19)

Like all supervisors, Grass' recommendations had to be reviewed and approved by the next

higher level of management.  (JEV Dep. 52:23-59:10, 75:11-76:6)

a.   **Hiring**

Grass interviewed applicants and made hiring recommendations to Vandivier and Human

Resources.  (Grass Dep. 39:18-40:3; JEV Dep. 52:23-59:10)  Damar followed Grass'

recommendations unless the candidate did not pass the post-offer background check, including a

drug-screen.  (Snyder Aff. ¶ 10)  Grass does not recall any instance when his recommendation to

hire someone was not accepted.  (Grass Dep. 40:4-43:17)  Grass recalls interviewing and

recommending Brent Smith, Mike Smith, Nicholas Worley, and Jeremiah Gastineau, who were

all hired.  (Grass Dep. 43:18-44:12)

b.   **Promoting And Effecting Pay Change**

Grass recommended staffing changes, pay increases, and promotions for his staff.

(JEV Dep. 52:23-59:10; JEV Aff. ¶¶ 19, 20, Ex. G)  Throughout his employment, Grass

recommended pay increases for his staff.  (JEV Aff. ¶ 19)  Unless outside Damar's guidelines,

Vandivier and Human Resources would approve his recommendations.  (JEV Aff. ¶ 19; Snyder

Aff. ¶ 10)  Grass had discretion to provide employee perks such as Walmart gift cards and

uniform allotment two or three times a year.  (Grass Dep. 143:10-22)

On February 21, 2012, when faced with two staff resignations, Grass emailed Vandivier

recommending staff changes, including pay increases for two staff members.  (JEV Aff. ¶ 20,

Ex. G)  Grass recommended (1) that the hourly pay rate for Les Brown, who had been offered a

11

$2.00 raise with another company and had submitted his resignation, be increased from $12.00 to $14.00, and (2) that Tom Hill, who had not resigned, receive a $2.00 increase from his hourly rate of $15.00 to $17.00.  (JEV Aff. ¶ 20)  Even though Damar was under a wage freeze, Vandivier supported Grass' recommendations and Brown and Hill received the $2.00 hourly raises and promotions.  (JEV Aff. ¶ 20)

### c.   Evaluating

Grass conducted Annual Performance Appraisals for Maintenance employees. (Grass Dep. 52:19-53:18; JEV Aff. ¶ 18; Snyder Aff. ¶ 5, Ex. B)  Before Maintenance had four leads reporting to Grass, he evaluated every Maintenance Department employee and completed the evaluation forms before forwarding to Vandivier.  (Grass Dep. 177:7-25)  Grass continued to review and approve performance reviews for Maintenance Department employees until the end of his employment.  (Snyder Aff. ¶ 5, Ex. B; JEV Aff. ¶ 18).  Grass signed the Appraisals for the thirteen Maintenance employees who were evaluated in late 2011 and 2012.  (Snyder Aff. ¶ 5, Ex. B)

### d.   Disciplining

Grass had the authority to recommended discipline for employees who were unable to perform their duties.  (Grass Dep. 104:11-105:13, 110:20-111:2)  Grass had the authority to recommend firing members of his staff, which recommendations, like hiring and promotion recommendations, had to be approved by Vandivier and Human Resources. (JEV Dep. 52:23-59:10, 75:11-76:6)

### 4.   <u>Selection And Management Of Vendors And Contractors</u>

In addition to his responsibilities involving employees, Grass solicited bids from, negotiated prices with, and oversaw vendors and contractors.  (Grass Dep. 53:19-54:3; JEV Aff. ¶ 17)  Grass selected multiple vendors and contractors during his Damar employment,

US.53871623.01

including W I Motor Supply, D-Glass, Petigo Chevrolet, and Matt Dean Carpet.

(Grass Dep. 56:10-57:24)  Grass chose D-Glass to repair windshields (Grass Dep. 140:1-16) and

agreed to pay a premium rate because D-Glass used factory replacement glass instead of

aftermarket and he believed D-Glass could repair the windshields faster than other vendors.

(Grass Dep. 140:14-143:9)

## III.    STANDARD OF REVIEW

Summary judgment is appropriate when the record shows "no genuine dispute as to any

material fact and the movant is entitled to a judgment as a matter of law."

Fed. R. Civ. P. 56(a), (c); see also Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).  The

moving party need not positively disprove the opponent's case; rather, it may prevail by

establishing the lack of evidentiary support for that case.  See Celotex, 477 U.S. at 327.  The

nonmoving party may not simply rest upon the pleadings but must, instead, submit evidentiary

materials that set forth specific facts showing that there is a genuine issue for trial.  Woosley v.

C.R. England, Inc., 890 F. Supp. 2d 1068, 1071 (S.D. Ind. 2012).  Mere speculation or conjecture

will not defeat a summary judgment motion.  Packman v. Chicago Tribune Co., 267 F.3d 628,

637 (7th Cir. 2001).  Neither the "mere existence of some alleged factual dispute between the

parties," Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986), nor the existence of

"some metaphysical doubt as to the material facts," Matsushita Elec. Indus. Co. v. Zenith Radio

Corp., 475 U.S. 574, 586 (1986), will defeat a motion for summary judgment.  Michas v. Health

Cost Controls of Ill., Inc., 209 F.3d 687, 692 (7th Cir. 2000).  "The mere existence of a scintilla

of evidence in support of the plaintiff's position will be insufficient; there must be evidence on

which the jury could reasonably find for the plaintiff."  Anderson, 477 U.S. at 252.  "If the

evidence is merely colorable, or is not significantly probative, summary judgment may be

granted."  Id. at 249-250 (citations omitted).

US.53871623.01

IV.   **ARGUMENT**

    A.   **Grass Was An Executive Employee Exempt From The FLSA's Minimum Wage And Overtime Provisions**

Grass is not entitled to overtime compensation (or minimum wage) under the Fair Labor Standards Act of 1938 ("FLSA") because he is "employed in a bona fide executive . . . capacity." 29 U.S.C. § 213(a)(1).  Damar must demonstrate that Grass fits within this exemption by showing that he:

> (1)    was compensated on a "salary basis" at a rate not less than $455 per week;
>
> (2)    had as his primary duty management of the enterprise or a customarily recognized department or subdivision of the enterprise;
>
> (3)    customarily and regularly directed the work of two or more full-time employees or their equivalent; and
>
> (4)    had the authority to hire or discharge other employees, or his suggestions and recommendations as to the hiring, firing, advancement, promotion or any other change of status is given *particular weight*.

29 C.F.R. § 541.100(a)(1)-(4) (emphasis added).

Based on the undisputed facts, Grass was exempt under the executive exemption because he (1) was compensated on a salary basis at a rate of $1,145.60 per week; (2) had as his primary duty management of the entire maintenance department; (3) customarily and regularly directed the work of between 4 and 16 employees; and (4) was the primary decision-maker with respect to hiring, disciplining; evaluating, promoting, effecting pay increases, and other change of status relating to all Maintenance employees.

    1.   **Grass Was Compensated On A Salary Basis**

To satisfy the salary basis requirement, first Grass must have received at least $455 per week.  29 C.F.R. § 541.100(a)(1).  Second, Grass must have regularly received each pay period a predetermined amount constituting all or part of his compensation, which amount was not

14

subject to reduction because of variations in the quality or quantity of the work he performed or because of the number of days or hours worked.  29 C.F.R. § 541.602(a).

Grass satisfies the salary-basis prong of the executive exemption because, except for the first pay period,[14] he was paid a bi-weekly salary nearly three times the required amount for the entire three-year time period prior to the end of his employment.  (Snyder Aff. ¶ 3, Ex. A) During that three-year time period, Grass <u>never</u> received less than his weekly salary. (Snyder Aff. ¶ 3, Ex. A)  Damar <u>never</u> deducted from Grass' salary for time off work or any other reason.  (Snyder Aff. ¶ 3, Ex. A)

Based on the undisputed evidence, Damar satisfies the salary-basis test.

### 2.      Grass Supervised The Requisite Number Of Employees

To satisfy this prong of the executive exemption, Damar must show that Grass customarily and regularly directed the work of two or more full-time employees or their equivalent.  29 C.F.R. § 541.100(a)(3).  The FLSA defines the term "customarily and regularly" as a frequency greater than occasional but which may be less than constant, i.e. "normally and recurrently performed every workweek."  29 C.F.R. § 541.701.

Grass acknowledges that, during the relevant time period, he either directly or indirectly supervised a minimum of four to twelve Maintenance employees.  (Grass Dep. 17:17-21:14)  In 2012, Damar employed sixteen non-exempt Maintenance employees under his direct or indirect supervision.  (Snyder Aff. ¶ 7)  Grass signed the Annual Performance Appraisal for every Maintenance employee given an Appraisal in late 2011 and 2012.  (Snyder Aff. ¶ 5, Ex. B)

Based on the undisputed evidence, Grass directed the work of the requisite number of employees.

---

[14]     Grass' first pay of the three-year period reflected his prior bi-weekly salary of $2,226.40.  The remainder of the time, he was paid $2,291.20.  (Snyder Aff. ¶ 3, Ex. A)

### 3.    Grass' Primary Duty Was Managing Damar's Maintenance Department

To satisfy this prong of the exemption, Damar must show that Grass' primary duty was management of "a customarily recognized department" of Damar – the Maintenance Department. 29 C.F.R. § 541.100(a)(2). "Management" includes but is not limited to:

> activities such as interviewing, selecting, and training of employees; setting and adjusting their rates of pay and hours of work; directing the work of employees; maintaining production or sales records for use in supervision or control; appraising employees' productivity and efficiency for the purpose of recommending promotions or other changes in status; handling employee complaints and grievances; disciplining employees; planning the work; determining the techniques to be used; apportioning the work among the employees; determining the type of materials, supplies, machinery, equipment or tools to be used or merchandise to be bought, stocked and sold; controlling the flow and distribution of materials or merchandise and supplies; providing for the safety and security of the employees or the property; planning and controlling the budget; and monitoring or implementing legal compliance measures.

29 C.F.R. § 541.102.

A "customarily recognized department" is one that has a permanent status and continuing function, such as Damar's Maintenance Department. 29 C.F.R. § 541.103(a).

"'Primary duty' means the principal, main, major or most important duty that the employee performs." 29 C.F.R. § 541.700(a). This factor has four sub-factors: (a) the relative importance of the exempt duties as compared with other types of duties; (b) the amount of time spent performing exempt work; (c) the employee's relative freedom from direct supervision; and (d) the relationship between the employee's salary and the wages paid to other employees for the kind of nonexempt work the employee performs. 29 C.F.R. § 541.700(a).

"Determination of an employee's primary duty must be based on all the facts in a particular case, with the major emphasis on the character of the employee's job as a whole." Id. Damar satisfies the primary duty factor because the overarching character of Grass' position as

16

Maintenance Supervisor and Facility Maintenance Director was management of the Maintenance Department.

In Thomas v. Speedway SuperAmerica, LLC, the court analyzed the four sub-factors and found that a Speedway gas station store manager, who worked at least 50 hours per week and remained on call "24 hours a day, seven days a week" was covered by the FLSA's executive exemption even though she alleged that she spent 60 percent of her time performing non-managerial tasks; such as stocking merchandise.  506 F.3d 496, 499 (6th Cir. 2007).  In finding in favor of the employer, the court cited evidence that the plaintiff:

> supervised, interviewed, hired, trained, and disciplined employees . . . prepared weekly work schedules for her employees . . . resolved employee complaints . . . monitored her employees' performance with formal evaluations . . . recommended salary or merit increases for her employees (most of which were accepted by her district manager) . . . frequently recommended employee terminations to her district manager . . . .

Id.  The facts of Thomas, including job responsibilities, are nearly perfectly aligned with those of this case.

The undisputed facts demonstrate that Grass' primary duty was managing the Maintenance Department.

### a.    Grass' Exempt Duties Were Substantially More Important Than His Non-Exempt Duties

Under this subfactor, "courts must compare the importance of the plaintiff's managerial duties with the importance of her non-managerial duties, keeping in mind the end goal of achieving the overall success of the company."  Thomas, 506 F.3d at 505.  In determining the relative importance of exempt duties, courts consider factors such as:  whether other employees perform the exempt duties and whether other employees perform the non-exempt duties.  See Id. at 505; Slusser v. Vantage Builders, Inc., 576 F.Supp.2d 1207, 1218 (D. N.M. 2008).

After comparing the plaintiff's non-managerial duties, which included stocking shelves, sweeping, and cleaning bathrooms to her managerial duties – hiring, training employees, and assigning the weekly work schedule – the Thomas court concluded that the store would still function if she failed to perform her non-managerial duties, but it would not function at all if she failed to perform her managerial duties of hiring, training, and scheduling, for no one would perform those essential tasks.  506 F. 3d at 505.  Thus, her managerial duties "were much more important to Speedway's success than her non-managerial duties."  Id.

In Slusser v. Vantage Builders, Inc., the court found that the Assistant Controller's managerial duties outweighed her non-managerial duties.

> Although Plaintiff spent significant time preparing paperwork and entering data, she was one of many employees to complete this work. Relatively speaking, therefore, the work was less important than Plaintiff's managerial duties. There was no evidence in the record that anyone other than Plaintiff had the duty of assigning work to the employees she supervised, directing the work of these employees, apportioning the work among these employees, and answering the questions of these employees. These management duties, vested solely in Plaintiff, were more important than the data entry duties undertaken by Plaintiff and many lower-level employees  . . . . Plaintiff's management duties were also indispensable for the day-to-day operations of the payroll department. The evidence indicates that although Mr. Porter had authority over Plaintiff, it was Plaintiff, and not Mr. Porter, who supervised the day-to-day activities of the payroll clerks. Without this supervision, the payroll department could not have continued its day-to-day operations. Accordingly, Plaintiff's managerial duties outweigh Plaintiff's non-managerial duties. This factor, therefore, weighs in favor of finding Plaintiff's managerial duties primary.

576 F.Supp.2d 1207, 1218 (D. N.M. 2008).

Like the Thomas plaintiff, Grass' managerial duties were far more important than his non-managerial ones in achieving Damar's overall successful operations.  Grass testified that his non-managerial tasks included toilet repair, picking up trash, mowing, equipment and appliance repair, swimming pool maintenance and repair, vehicle maintenance and repair, and repairing

18

windows, kitchen equipment, and heating and air conditioning, but time he spent doing non-managerial work was by his choice as he had staff to assign and access to outside contractors upon whom to rely.  (Grass Dep. 79:13-80:5, 104:4-107:3, 161:11-24; JEV Aff. ¶¶ 10-12)  Grass also had authority to call outside service providers to respond.  (Grass Dep. 105:20-106:9; JEV Aff. ¶ 11)  Further, if the staff lacked the requisite expertise to perform a maintenance task, it was within his responsibilities to train them to be able to do so. (JEV Dep. 47:22-49:13, 72:19-22 (errata), Exs. 13, 14; JEV Aff. ¶ 12)  Like the <u>Slusser</u> plaintiff, Grass was one of many who did Maintenance work, but his management duties were indispensable for day-to-day Maintenance operations.  (JEV Aff. ¶ 11)

In short, Grass' non-managerial functions were performed or were capable of being performed by a subordinate or an outside contractor.  The Maintenance Department would still function without Grass performing these tasks.  (JEV Aff. ¶ 11)

Grass' important managerial duties included soliciting bids, negotiating prices, and selecting, overseeing, and working with vendors and contractors.  (Grass Dep. 53:19-54:16) Grass interviewed candidates and routinely made hiring, promotion, and pay raise recommendations that were routinely approved; he conducted Annual Performance Appraisals for Maintenance employees; and he also had the authority to recommend discipline and discharge.  (Grass Dep. 39:18-43:17, 104:11-105:13, 110:20-111:2; JEV Dep. 52:23-59:10, 75:11-76:6, JEV Aff. ¶¶ 18, 19; Snyder Aff. ¶ 5, Ex. B; ¶ 10)  Moreover, Grass' leadership of the staff, including staff training, were primary responsibilities of his position. (JEV Dep. 47:22-49:13, 72:19-22 (errata), Exs. 13, 14; JEV Aff. ¶ 8)

The importance of Grass' management duties are punctuated by his oversight of a department with a budget of nearly $1,000,000 and responsibility for the maintenance and repair of 40 buildings, more than 46 acres of property, and Agency vehicles; significantly, between

1,200 and 1,450 developmentally and behaviorally challenged clients and between 823 and 924 employees relied on the performance of Grass' department.  (JEV Aff. ¶ 3, Ex. A; Snyder Aff. ¶¶ 9, 11)  Had Grass failed to perform his managerial duties, the care, comfort, and safety of hundreds of clients and hundreds of employees would have ground to a halt with immeasurable consequences.  (JEV Aff. ¶ 11; Snyder Aff. ¶ 11)  On the other hand, the consequences of Grass' failure to assist in daily maintenance of the property and equipment would have had no greater impact than the same failure of a single non-exempt employee or a single outside service provider.

As in the above-cited cases, Grass' managerial duties were much more important to Damar's successful operations than his non-managerial ones.

### b.     The Amount Of Time Grass Performed Exempt Work Is Not Determinative

Grass performed many exempt duties daily, but he contends he spent 65-70% of his time performing non-exempt duties.  (Grass Dep. 149:3-17)  But, "nothing in [the regulations] requires that exempt employees spend more than 50% of their time performing exempt work."  29 C.F.R. § 541.700(b).  Even assuming for purposes of this Motion that Grass spent more than 50% of his time performing non-exempt duties, he will, nonetheless, meet the primary duty requirement if the other factors support such a conclusion.  See 29 C.F.R. § 541.700(b).  Courts have found managers exempt even when they performed a far greater proportion of non-exempt work than Grass alleges he did.

In Thomas v. Speedway SuperAmerica, LLC, the court held the employee was an exempt executive and affirmed summary judgment in the employer's favor even though the employee spent 60% of the time performing non-exempt duties.  506 F.3d 496, 505 (6th Cir. 2007).  See also Jones v. Va. Oil Co., 69 Fed. Appx. 633, 2003 WL 21699882 (4th Cir. July 23, 2003) (Employee was an exempt executive, even though the employee spent 75-80% of the time

performing non-exempt duties.); <u>Cort v. Kum & Go, L.C.</u>, 923 F.Supp.2d 1173 (W.D. Mo. 2013) (Employee was an exempt executive despite spending 80% of the time performing non-exempt duties.).

In <u>Leonard v. Dolgencorp, Inc.</u>, the court held the plaintiff was an exempt executive and granted summary judgment in the employer's favor even though the employee spent 70% of the time performing non-exempt duties.  2011 WL 2009937 (W.D. Ky. May 23, 2011).  The Court stated:

> Leonard spends about 70% of her time on manual labor or non-management issues . . . .  Dollar General makes a strong case, however, that even a small store could not function without one person actually taking responsibility for essential tasks . . . . The Court concludes that the Dollar General store could not effectively operate without Leonard functioning as the Store Manager. Her management duties are absolutely critical to day-to-day store operation. Without her, no one else had the ongoing responsibility to direct on-site actions. Anyone can do the manual labor, but someone must be responsible for overall operations and that someone is not the District Manager. Even though she may have performed non-managerial work a majority of the time, successful management of Leonard's store depended totally on her own decisionmaking and judgment. Accordingly, the Court finds that the relative importance of Leonard's management responsibility exceeds those of her more time-consuming nonmanagement activities.

<u>Id.</u> at *6-7.

Even a plaintiff claiming to do non-exempt work <u>99%</u> of the time has been found to be an exempt executive, warranting summary judgment in the employer's favor.  <u>In re Family Dollar FLSA Litig.</u>, 637 F.3d 508 (4th Cir. 2011).  In that case, the court stated:

> Grace contends that because 99% of her time was devoted to nonexecutive duties, at least a genuine issue of material fact exists about whether she was an executive, precluding the entry of summary judgment against her . . . . But the regulation explains that time alone "is not the sole test, and in situations where the employee does not spend over 50 per cent of his time in managerial duties, he might nevertheless have management as his primary duty if the other pertinent factors support such a

US.53871623.01

conclusion." . . . There is no per se rule that once the amount of time spent on manual labor approaches a certain percentage, satisfaction of this factor is precluded as a matter of law . . . . In this case, Grace was in charge of a separate retail store, seeking to make it profitable. While she catalogs the nonmanagerial jobs that she had to do, claiming that they occupied most of her time, she does so without recognizing that during 100% of the time, even while doing those jobs, she was also the person responsible for running the store. Indeed, there was no one else to do so, and it cannot be rationally assumed, nor does the record support a claim, that the store went without management 99% of the time. Grace also fails to acknowledge the importance of performing nonmanagerial tasks in a manner that could make the store profitable, the goal of her managerial responsibility.

Id. at 514-15.

Like the plaintiffs in the cases cited above, Grass was responsible for the overall functioning of his Department.  The importance of his management responsibility far exceeded that of his (allegedly) more time consuming non-managerial activities.  Other Maintenance employees could have done the manual labor; others could not have scheduled, assigned and directed work, trained, evaluated, hired, determined appropriate pay, managed outside vendors and contractors, or oversaw and directed the overall functions of a large group of employees working at multiple sites.  (JEV Aff. ¶¶ 6, 8, 11, 12, 18-20)

### c.    Grass Was Essentially Free From Direct Supervision

Relevant considerations in determining the freedom from direct supervision include: whether the employee was the highest ranking employee on-site; whether the employee generally worked without a supervisor looking over his shoulder monitoring his every move; and whether the employee, without the supervisor's involvement, assigned work to other employees, directed work of other employees, apportioned work among other employees, and disciplined other employees.  See Thomas v. Speedway SuperAmerica, LLC, 506 F.3d 496, 507-08 (6th Cir. 2007); Slusser v. Vantage Builders, Inc., 576 F.Supp.2d 1207 (D. N.M. 2008).  The

undisputed facts establish that Grass ran the Maintenance Department with very little supervision.

In Thomas, the plaintiff's manager visited the store approximately two times per week, communicated with her frequently by phone and email, and remained constantly available to her. 506 F.3d 496, 507 (6th Cir. 2007).  The Court stated:

> While these facts establish that Thomas was not completely free from oversight, we reiterate that the third factor considers only the "*relative* freedom from supervision"; it does not demand complete freedom from supervision, such that she is answerable to no one, as this would disqualify all but the chief executive officer from satisfying this factor of the primary duty inquiry.
>
> A "local store manager's job is [no] less managerial for FLSA purposes simply because ... she has an active [district manager]." [Citation omitted] None of Beatty's various forms of oversight or assistance—weekly visits, frequent calls and emails, or constant availability—demonstrate that Thomas did not have "relative freedom from supervision." A district manager's periodic visits, as often as a few days each week, do not negate a finding that the store manager operates free from supervision when the district manager is absent.

Id.

Grass was the highest ranking Maintenance employee on site.  (Grass Dep. 27:2-19)  His supervisor, Vandivier, worked in a separate building across campus, approximately 300 yards away.  (Grass Dep. 28:6-22; JEV Aff. ¶ 7)  Grass typically saw Vandivier only two or three times a week in passing in the parking lot or when Grass placed mail in Vandivier's mailbox at the Family Services Center.  (Grass Dep. 28:23-29:13; JEV Aff. ¶7)  Vandivier typically monitored Maintenance Department activity through Grass' written reports and conversations with Grass and other members of the Maintenance team.  (Grass Dep. 29:20-25)  In Grass' 2006-07 Appraisal, Vandivier noted that Grass "works well independently.  Requires very little supervision." (JEV Dep. 47:22-49:13, Ex. 4 (Damar 145))  In Grass' 2010 Appraisal, Vandivier

23

noted that Grass "stays in contact but very capable of handling any situation with no supervision." (JEV Dep. 45:18-46:15, Ex. 3 (Damar 140))

Grass independently distributed work orders to his employees, and he and the leads under his direction prioritized the maintenance jobs to be completed. (Grass Dep. 155:18-23, 180:12-25) Grass reviewed all Maintenance employees' time cards and made corrections and adjustments to their reported time, including approving overtime. (Grass Dep. 34:3-36:11) Grass reviewed and approved all Maintenance staff requests for personal time off. (Grass Dep. 36:12-21)

Grass had the authority, without Vandivier's approval, to schedule employees for overtime needs and did so regularly. (Grass Dep. 105:20-107:3; JEV Aff. ¶¶ 10, 11) Grass had and exercised the authority to discipline on-call employees if they failed to respond when on-call. (Grass Dep. 104:4-25; JEV Dep. 52:23-59:10, 75:11-76:6) Grass also had and exercised authority to call outside service providers to respond. (Grass Dep. 105:20-106:9; JEV Aff. ¶¶ 10, 11, 12) Grass solicited bids from and negotiated prices with, selected, oversaw, and worked with vendors and contractors. (Grass Dep. 53:19-54:16) Grass undertook all of these substantial responsibilities with very little interaction or communication with Vandivier.

Unlike the plaintiff's supervisor in <u>Thomas</u>, who was an active manager, Vandivier was a passive manager, who testified he did not know how much time Grass spent doing any particular task. (JEV Dep. 74:23-75:10) The undisputed facts demonstrate that Grass had nearly complete freedom from direct supervision, and he certainly had *relative* freedom from direct supervision. 29 C.F.R. § 541.700(a). Thus, this factor weighs in favor of a finding that Grass' primary duty was management of the Maintenance Department.

US.53871623.01

        **d.**       **The Relationship Between Grass' Salary And Wages Paid To Other Employees For Similar Kinds of Non-Exempt Work**

The regulations do not provide a method by which to analyze the relationship between the wages of an exempt supervisor and his employees.  However, the leading case, <u>Thomas v. Speedway SuperAmerica, LLC</u>, provides a framework for which comparisons can be made – looking to the hourly pay rate for the "kind" of non-exempt work performed by the supervisor. 506 F. 3d 496, 508 (6th Cir. 2007)  This framework contemplates an assessment of hourly rates and gross compensation.

In <u>Thomas</u>, the court converted the plaintiff's pay to an hourly rate and compared it to other employees' rates; further, the court compared the plaintiff's total pay to the next highest grossing employee.  506 F.3d at 508-9.

Here, Grass says he did non-exempt work ranging from working on toilet repairs, picking up trash, mowing and repairing windows to repairing kitchen and pool equipment and heating and air conditioning systems.  (Grass Dep. 79:13-80:5, 161:11-24)  By its nature, some of this work requires technical skill and expertise (heating and air conditioning) while other is low- or non-skilled manual labor (repairing toilets, mowing, and picking up trash).

Grass' effective hourly rate of $28.64[15] was substantially higher than the highest paid, highly skilled Maintenance employee, Mike Smith, who earned $22.50 per hour, and the next highest paid, long-term employee Mikhail Malyovanny, who earned $19.86 per hour.  (Snyder Aff. ¶ 7)  Further, Grass' rate was about 233% higher than the lowest $12.00 hourly rate. (Snyder Aff. ¶ 7)

---

[15]    Even if Grass' hourly rate is calculated based on his annual gross pay working 60 hours per week (which he claims to have worked but which is not supported by his Salaried Time Sheets), including holiday weeks, vacation, and the weeks he was on administrative leave, his hourly rate would be $19.94.  His rate is substantially more than the average hourly pay of $16.17 and the median hourly rate of $16.32 for the non-exempt Maintenance employees; it is $.32 more than Malyovanny's $19.62 hourly rate.  (Snyder Aff. ¶ 7)

US.53871623.01

Grass' gross pay for 2011 and 2012 was $62,142.16 and $62,199.44, respectively, compared to the 2012 gross pay of the two highest paid hourly Maintenance employees (Smith, $35,066.12; Malyovanny, $46,159.65).  (Snyder Aff. ¶ 8)  The gross pay for Alvey, a Maintenance employee who worked all of 2012 earning $12.24 hourly, was $24,495.51.  (Snyder Aff. ¶ 8)

Grass does not claim to have done any skilled woodworking similar to the "kind" done by Smith.  Grass' work was more like the work of a highly skilled Maintenance employee such as Malyovanny, a 21-year Damar employee.  (Snyder Aff. ¶ 7)  Grass' unskilled work could have been performed by the lowest paid employees ($12.00 or $12.24).  (JEV Aff. ¶ 11; Snyder Aff. ¶ 7)

Based on its comparison of the plaintiff's wages to those she supervised, the <u>Thomas</u> court concluded the fourth factor weighed in favor of finding the plaintiff's primary duty was management.  <u>Id.</u>  That conclusion applies equally in this case, especially when Grass, who was over a substantial operation rather than over a single Speedway station, had the authority to assign staff to do this work, even on overtime, or to engage outside service providers to do the non-exempt work.

**4.** **<u>Grass' Suggestions And Recommendations As To Hiring, Evaluating, Pay Changes, Effecting Promoting And Discipline Were Given Extraordinary Weight</u>**

To satisfy this final prong, Grass must have either had the authority to hire or discharge other employees or his suggestions and recommendations as to the hiring, firing, advancement, promotion or any other change of status must have been given "particular weight."  Factors to determine whether Grass' suggestions and recommendations are given "particular weight" include, but are not limited to: (1) whether making such suggestions and recommendations was part of his job duties; (2) the frequency with which he made such suggestions and

26

recommendations; and (3) the frequency with which Damar relied on his suggestions and recommendations.  29 C.F.R. § 541.105.

Grass satisfies this final prong because his frequent and routine hiring, advancement, and compensation recommendations were given substantial weight.  While his recommendations were subject to review and approval by his supervisor and Human Resources, they were routinely approved unless they were outside Damar's guidelines.  For example, Grass routinely interviewed applicants and made hiring recommendations, which were always followed unless the candidate did not pass the post-offer background check, including a drug-screen. (Grass Dep. 39:18-40:3; JEV Dep. 52:23-59:10; Snyder Aff. ¶ 10)  Grass  specifically recalled interviewing and recommending no fewer than four individuals, who were all hired. (Grass Dep. 43:18-44:12)

Grass also recommended staffing changes as well as pay increases and promotions for his staff.  (JEV Dep. 52:23-59:10; JEV Aff. ¶¶ 19, 20, Ex. G)  Vandivier routinely approved his recommendations and forwarded them to Human Resources, which approved them so long as they were within Damar's pay guidelines.  (JEV Aff. ¶ 18; Snyder Aff. ¶ 10)  For example, on February 21, 2012, when Damar was under a wage freeze, Grass recommended two staff changes, including pay increases.  (JEV Aff. ¶ 20, Ex. G)  Vandivier supported Grass' recommendations, which were approved.  (JEV Aff. ¶ 20)  Grass also had discretion to provide employee perks such as Walmart gift cards and uniform allotments two or three times a year. (Grass Dep. 143:10-22)

Grass conducted Annual Performance Appraisals for Maintenance employees, and he had the authority to recommend discipline for employees who were unable to perform their duties. (Grass Dep. 52:19-53:18, 104:11-105:13, 110:20-111:2; Snyder Aff. ¶ 5, Ex. B)  Grass could recommend firing his subordinates, which recommendations, like hiring and promotion

27

recommendations, had to be approved by Vandivier and Human Resources.

(JEV Dep. 52:23-59:10, 75:11-76:6)

An executive's suggestions and recommendations may be deemed to have "particular weight" even if a higher level manager's recommendation has more importance and even if the employee does not have authority to make the ultimate decision.  29 C.F.R. § 541.105.  See also Conroy v. City of Chicago, 644 F. Supp.2d 1061, 1071 (N.D. Ill. 2009) (Police superintendents satisfied the particular weight factor where they recommended whether subordinates qualify for step increases, and plaintiff testified she could not remember a time when the deputy director disagreed with one of her recommendations.); Rainey v. McWane Inc., 314 Fed. Appx. 693, 696, 2009 WL 631610, *2 (5th Cir. 2009) (Production supervisors satisfied particular weight factor where evidence showed they exclusively evaluated provisional workers and made hiring recommendations as to regular employees, and production supervisors did not provide any evidence to contradict this practice or indicate that their recommendations were not typically followed.); Lovelady v. Allsup's Convenience Stores, Inc., 304 Fed. Appx. 301, 305-6, 2008 WL 5381348, *3 (5th Cir. 2008) (Particular weight factor met where employees testified that their recommendations were almost always followed.).

As in the above-cited cases, Grass could not recall any instance when his recommendation to hire someone was not accepted.  (Grass Dep. 40:4-43:17)  He had considerable input into all decisions relating to the terms and conditions of the Maintenance employees' employment, and he has no evidence to demonstrate that his recommendations were not typically followed.

As demonstrated by the discussions in prior sections, Grass' recommendations and decisions as to all aspects of the terms and conditions of his staff's employment were overwhelmingly accepted and implemented.  Grass essentially functioned independently of his

28

supervisor with whom he communicated infrequently and who demonstrated his total confidence in Grass' leadership as reflected in Grass' Annual Performance Appraisals.  (JEV Dep. 43:15-46:22, 47:22-49:13, Exs. 1-6, 8-17)

The undisputed evidence readily establishes that Grass' recommendations were afforded the particular weight to satisfy this final prong of the executive exemption.

**B.**   **Grass' Claims Under The Indiana Minimum Wage Act Fail Because Damar Is Not An Employer Subject To The Act**

Grass' third cause of action seeking relief under Indiana's statutory overtime provision should be dismissed because Damar is not an "employer" under the statute.  After first arguing that Damar is subject to the FLSA, Grass inconsistently argues that Damar is subject to Indiana's overtime laws.  However, Indiana's overtime provisions, Ind. Code § 22-2-2-4, are part of the Minimum Wage Law of 1965, which excludes employers subject to the FLSA.  By its terms, the Minimum Wage Law defines the term "employer" as follows:

> **"Employer"** means any individual, partnership, association, limited liability company, corporation, business trust, the state, or other governmental agency or political subdivision during any work week in which they have two (2) or more employees. However, it **shall not include any employer who is subject to the minimum wage provisions of the federal Fair Labor Standards Act of 1938, as amended (29 U.S.C. 201-209).**

Ind. Code § 22-2-2-3 (emphasis added).  See also Edmonds v. Feralloy Midwest Corp., No. 2:07-cv-266-PS, 2009 WL 1605156, at *7 (N.D. Ind. Jun. 3, 2009) (holding that the minimum wage and overtime provisions of the Indiana Wage Payment Statute "does not apply to employers who are 'subject to the minimum wage provisions of the federal Fair Labor Standards Act of 1938.'" (quoting Ind. Code § 22-2-2-3 and citing Parker v. Schilli Transp., 686 N.E.2d 845, 850-851 (Ind. Ct. App. 1997)).  Simply put, Indiana's overtime law specifically excludes from its coverage any employer subject to the FLSA minimum wage provisions.

US.53871623.01

Damar is an employer subject to the FLSA and subject to the minimum wage and maximum hours provisions of the FLSA.  Under the FLSA, an "employer" is

> any person acting directly or indirectly in the interest of an
> employer in relation to an employee and includes a public agency,
> but does not include any labor organization (other than when
> acting as an employer) or anyone acting in the capacity of officer
> or agent of such labor organization

29 U.S.C.A. § 203(d).  "Person" includes "an individual, partnership, association, corporation, business trust, legal representative, or any organized group of persons." 29 U.S.C.A. § 203(a). An employer is subject to the FLSA if it is engaged in commerce or in the production of goods for commerce, which Damar is.  29 U.S.C.A. § 203(s).

Damar is not covered by Indiana's Minimum Wage Law, so the Court should dismiss Grass' claim in its entirety.[16]

### C.  Grass' Claim For Wages Under The Indiana Wage Claims Statute Fail Because He Received All Wages To Which He Is Entitled

Finally, Grass seeks liquidated damages and pre-judgment interest pursuant to Ind. Code § 22-2-9-2 (the Indiana "Wage Claims Statute").   This claim fails because the Wage Claims Statute applies only to employees who are involuntarily terminated. Ind. Code § 22-2-9-2.  Specifically, the Wage Claims Statute applies only to "employees who have been separated from work by their employer and employees whose work has been suspended as a result of an industrial dispute.  Ind. Code § 22-2-9-2(a)(b).  By contrast, the Wage Payment Statute covers current employees and those who have voluntarily left employment. Ind. Code § 22-2-5-1(b)."  St. Vincent Hosp. and Health Care Ctr., Inc. v. Steele, 766 N.E.2d 699, 705 (Ind. 2002).  It is undisputed that Grass resigned his employment with

---

[16]     Even if the Minimum Wage Law applied to Damar, which it does not, Grass would be excluded from coverage under the State's executive exemption.  Specifically, the Minimum Wage Law's definition of "employee" excludes "[t]hose persons employed in executive . . . occupations who have the authority to employ or discharge and who earn one hundred fifty dollars ($150) or more a week."  For the reasons set forth in IV.A and B, Grass is not a covered employee under Indiana's Minimum Wage Law.

Damar.  (Grass Dep. 61:5-19, Ex. 9)  Grass' resignation prevents him from pursuing a claim

under Indiana's Wage Claims Statute, so his claim fails as a matter of law.

More importantly, any claim Grass could arguably assert under the Wage Claim Statute

fails because he received all the wages to which he was entitled.  Grass received his full salary

for each and every week for the three-year period prior to the end of his employment.  (Grass

Dep. 31:7-32:7; Snyder Aff. ¶ 3, Ex. A)  Additionally, he was paid all unused PTO in his last

paycheck.  (Snyder Aff. ¶ 14)  For these reasons and those discussed above, Grass' claim fails.

## V.     CONCLUSION

For the reasons stated above, Damar respectfully requests the Court to grant its Motion

for Summary Judgment in its entirety.

Respectfully submitted,

FAEGRE BAKER DANIELS LLP

/s/Jeffrey S. Beck
Mitzi H. Martin (Indiana Atty. No. 10448-49)
Jeffrey S. Beck (Indiana Atty. No. 24793-29)
300 North Meridian Street, Suite 2700
Indianapolis, IN  46204
Telephone: (317) 237-0300
Facsimile:  (317) 237-1000
Email: mitzi.martin@FaegreBD.com
Email: jeffrey.beck@FaegreBD.com

Attorneys for Defendant, Damar Services, Inc.

**<u>CERTIFICATE OF SERVICE</u>**

I certify that on April 3, 2014, a copy of the foregoing was filed electronically.  Notice of

this filing will be sent by operation of the Court's electronic filing system.  Parties may access

this filing through the Court's system.

Lawrence M. Reuben
Aimee M. Gong
Law Offices of Lawrence M. Reuben
136 East Market Street, Suite 200
Indianapolis, IN  46204
Email:  reuben@reubenlaw.net
Email:  gong@reubenlaw.net


/s/Jeffrey S. Beck

32

US.53871623.01