UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

JAMES H. GRASS,                          )
       *Plaintiff*,                      )
                                        )
   *vs.*                                 )     1:13-cv-00310-JMS-DML
                                        )
DAMAR SERVICES, INC.,                    )
       *Defendant*.                      )

## ORDER

    Presently pending before the Court in this action brought under the Fair Labor Standards

Act ("FLSA"), the Indiana Wage Payment Act ("IWPA"), and the Indiana Wage Claims Act

("IWCA") are Defendant Damar Services, Inc.'s ("Damar") Motion for Summary Judgment,

[Filing No. 38], and Motion for Leave to Amend Defendant's Reply to Plaintiff's Response in

Opposition to Defendant's Motion for Summary Judgment, [Filing No. 48].  The crux of Da-

mar's Motion for Summary Judgment is that Mr. Grass was an exempt employee who is not enti-

tled to minimum wage and overtime pay under the FLSA.  Mr. Grass maintains that he was a

non-exempt employee.

## I.
### STANDARD OF REVIEW

    A motion for summary judgment asks the Court to find that a trial is unnecessary because

there is no genuine dispute as to any material fact and, instead, the movant is entitled to judg-

ment as a matter of law.  *See* Fed. R. Civ. P. 56(a).  As the current version of Rule 56 makes

clear, whether a party asserts that a fact is undisputed or genuinely disputed, the party must sup-

port the asserted fact by citing to particular parts of the record, including depositions, documents,

or affidavits.  Fed. R. Civ. P. 56(c)(1)(A).  A party can also support a fact by showing that the

materials cited do not establish the absence or presence of a genuine dispute or that the adverse party cannot produce admissible evidence to support the fact. Fed. R. Civ. P. 56(c)(1)(B). Affidavits or declarations must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant is competent to testify on matters stated. Fed. R. Civ. P. 56(c)(4). Failure to properly support a fact in opposition to a movant's factual assertion can result in the movant's fact being considered undisputed, and potentially in the grant of summary judgment. Fed. R. Civ. P. 56(e).

In deciding a motion for summary judgment, the Court need only consider disputed facts that are material to the decision. A disputed fact is material if it might affect the outcome of the suit under the governing law. *Hampton v. Ford Motor Co.*, 561 F.3d 709, 713 (7th Cir. 2009). In other words, while there may be facts that are in dispute, summary judgment is appropriate if those facts are not outcome determinative. *Harper v. Vigilant Ins. Co.*, 433 F.3d 521, 525 (7th Cir. 2005). Fact disputes that are irrelevant to the legal question will not be considered. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986).

On summary judgment, a party must show the Court what evidence it has that would convince a trier of fact to accept its version of the events. *Johnson v. Cambridge Indus.*, 325 F.3d 892, 901 (7th Cir. 2003). The moving party is entitled to summary judgment if no reasonable fact-finder could return a verdict for the non-moving party. *Nelson v. Miller*, 570 F.3d 868, 875 (7th Cir. 2009). The Court views the record in the light most favorable to the non-moving party and draws all reasonable inferences in that party's favor. *Darst v. Interstate Brands Corp.*, 512 F.3d 903, 907 (7th Cir. 2008). It cannot weigh evidence or make credibility determinations on summary judgment because those tasks are left to the fact-finder. *O'Leary v. Accretive Health, Inc.*, 657 F.3d 625, 630 (7th Cir. 2011). The Court need only consider the cited materi-

als, Fed. R. Civ. P. 56(c)(3), and the Seventh Circuit Court of Appeals has "repeatedly assured the district courts that they are not required to scour every inch of the record for evidence that is potentially relevant to the summary judgment motion before them," *Johnson*, 325 F.3d at 898. Any doubt as to the existence of a genuine issue for trial is resolved against the moving party. *Ponsetti v. GE Pension Plan*, 614 F.3d 684, 691 (7th Cir. 2010). On cross-motions for summary judgment, the Court construes facts and draws inferences "in favor of the party against whom the motion under consideration is made." *Keck Garrett & Associates, Inc. v. Nextel Communications, Inc.*, 517 F.3d 476, 483 (7th Cir. 2008) (quoting *In re United Air Lines, Inc.*, 453 F.3d 463, 468 (7th Cir. 2006)).

## II.
### BACKGROUND

#### A.  Procedural Background

At the outset, the Court is compelled to address a deficiency in Mr. Grass' brief in response to Damar's Motion for Summary Judgment.  Local Rule 56-1(e) provides:

> A party must support each fact the party asserts in a brief with a citation to a discovery response, a deposition, an affidavit, or other admissible evidence.  The evidence must be in the record or in an appendix to the brief.  *The citation must refer to a page or paragraph number or otherwise similarly specify where the relevant information can be found in the supporting evidence.*

Local Rule 56-1(e) (emphasis added); *see also* Fed. R. Civ. P. 56(c)(1)(A) ("A party asserting that a fact cannot be or is genuinely disputed must support the assertion by: (A) *citing to particular parts* of materials in the record….") (emphasis added).  Citing an entire lengthy document without pointing the Court to the page or paragraph number where such evidence can be found fails to comply with the dictates of Local Rule 56-1(e).

For example, for the proposition that Damar required him to "carry[y] a cell phone at all times to be available for phone calls, which [he] did," Mr. Grass cites to "Ex. B, Ex. F, Ex. C,"

but does not provide the page numbers of those exhibits which contain the referenced information. [Filing No. 45 at 10.] Exhibit B (filed as "Exhibit 2" on the CM/ECF system) is a forty-six page excerpt from Mr. Grass' deposition, [Filing No. 44-2], Exhibit F (filed as "Exhibit 6") is a forty-four page excerpt from Mr. Vandivier's deposition, [Filing No. 44-6], and Exhibit C (filed as "Exhibit 3") consists of ten pages of copies of Mr. Grass' Annual Performance Appraisals, [Filing No. 44-3]. To support the statement that Mr. Grass "frequently took maintenance calls during evenings, weekends, holidays and while on vacation," [Filing No. 45 at 10], he cites again to "Ex. B" (the forty-six page excerpt from his deposition), and also to "Ex. G" (filed as "Exhibit 7"), which is a forty-one page document that includes Damar's written discovery responses. [Filing No. 44-7.] This is insufficient under Local Rule 56-1(e) in that it does not provide the Court with the "page or paragraph number or otherwise similarly specify where the relevant information can be found in the supporting evidence." Local Rule 56-1(e).

The Local Rules make clear that the Court is under no obligation to review the evidence, such as lengthy deposition excerpts, in a wholesale fashion unless Mr. Grass specifically directs the Court to certain portions of it. Indeed, the Seventh Circuit has "repeatedly assured the district courts that they are not required to scour every inch of the record for evidence that is potentially relevant to the summary judgment motion before them," *Johnson*, 325 F.3d at 898, yet this is exactly what Mr. Grass expects in generally citing to lengthy documents in the record without pointing the Court to the specific "page or paragraph number," Local Rule 56-1(e).

Mr. Grass' failure to comply with the Federal and Local Rules in his response brief has consequences. In deciding Damar's Motion for Summary Judgment, the Court will only consider Mr. Grass' factual assertions that are supported by citations to record evidence that – when the exhibit is voluminous – include the page or paragraph number or otherwise sufficiently direct the

Court to the place in the cited document that supports the factual assertion in accordance with Federal Rule of Civil Procedure 56(c) and Local Rule 56-1(e). *See* Fed. R. Civ. P. 56(c)(3) (Court "need consider only the cited materials, but it may consider other materials in the record"). The factual background set forth below reflects this approach.

### B. Factual Background

The Court finds the following to be the undisputed facts, supported by admissible evidence in the record:

Damar is a not-for-profit agency that provides numerous community programs for children and adults with developmental and behavioral challenges. [Filing No. 40-3 at 2.] Between 2010 and 2012, Damar provided programs for between 1,200 and 1,450 clients on a daily basis. [Filing No. 40-4 at 4.] Damar employed an average of 823, 864, and 924 employees in 2010, 2011, and 2012, respectively. [Filing No. 40-4 at 4.]

#### 1. Damar's Maintenance Department

Damar's Maintenance Department maintains all Damar buildings and much of its grounds. [Filing No. 40-3 at 2.] In 2012, this included "almost 200,000 square feet in fifteen buildings on the main campus of approximately forty-six acres, four Medicare-licensed group homes, five DCS-licensed group homes, fifteen Transitional Service Line homes, two ancillary office properties, and a Charter School." [Filing No. 40-3 at 2.] The Operating Budget for the Maintenance Department in fiscal years ending June 30, 2011 and 2012 was $935,768.00 and $922,671.00, respectively. [Filing No. 40-4 at 4.]

#### 2. Maintenance Director Position

Joseph Vandivier was the Maintenance Director, in charge of all operations and safety, in 1998. [Filing No. 40-3 at 3.] In June 1998, Mr. Vandivier hired Mr. Grass as Maintenance Su-

pervisor. [Filing No. 40-1 at 10; Filing No. 40-3 at 3.] Mr. Vandivier told Mr. Grass that he ex-

pected Mr. Grass would use his technical expertise and experience to train the Maintenance De-

partment staff. [Filing No. 40-3 at 4.] Mr. Grass reported to Mr. Vandivier during the entire

time that he was Maintenance Director. [Filing No. 40-1 at 26.]

### 3.  *Facility Maintenance Director Position*

In August 2011, Mr. Grass requested that his title be changed to Facility Maintenance

Manager because "due to the fact that I have a ground manager, a garage manager and am re-

questing a campus supervisor[,]…supervisor does not cover my responsibilities." [Filing No. 40-

3 at 4; Filing No. 40-3 at 13.] In late 2011 or early 2012, Mr. Grass was promoted to Facility

Maintenance Director. [Filing No. 40-1 at 22-23; Filing No. 40-3 at 4.]

### 4.  *Job Duties as Maintenance Supervisor/Facility Maintenance Director*

#### a.  **Day-To-Day Management**

Mr. Grass' duties as both Maintenance Supervisor and Facility Maintenance Director

were the same. [Filing No. 40-1 at 22-23.] Those responsibilities included:

- Supervising maintenance staff;

- Ensuring that all maintenance inventories were kept at appropriate levels;

- Identifying physical plant and equipment issues and taking appropriate steps to remediate those issues efficiently and effectively;

- Soliciting and analyzing bids from contractors for repairs, renovations, and maintenance;

- Planning, scheduling, and coordinating general maintenance, major repairs and remodeling projects for the entire facility;

- Directing and coordinating the activities of contract personnel and evaluating their performance;

- Maintaining regular and adequate maintenance records to facilitate completion of work orders and projects in a timely manner;

- Conducting daily inspection of the physical plant facility;

- Developing and conducting routine, preventive, and seasonal maintenance schedules for buildings, grounds, equipment, and group homes;

- Being available to respond to emergency situations 24 hours per day;

- Being available to perform after hours checks periodically;

- Attending mandatory staff meetings and other meetings as assigned;

- Completing and updating mandatory training and other licensure related items in a timely manner;

- Maintaining accurate and legible documentation;

- Completing incident reports, including reporting any suspected exploitation, abuse, or neglect of a client;

- Seeking the best use of materials, equipment, and staff to maximize efficiency and effectiveness;

- Acting as a good steward of Damar and/or client finances;

- Developing and managing annual operating and capital budgets for the Maintenance Department; and

- Performing other duties as assigned.

[Filing No. 40-1 at 21-22; Filing No. 40-1 at 146; Filing No. 40-1 at 148.]

Mr. Grass supervised between three and twelve employees during his time at Damar.

[Filing No. 40-1 at 16-17.] In 2008 and 2009, Mr. Grass ultimately supervised approximately

twelve employees. [Filing No. 40-1 at 16-17.] In 2010 or 2011, the Maintenance Department

was reorganized to install four leads under Mr. Grass, and those leads reported to Mr. Grass and

had employees reporting to them. [Filing No. 40-1 at 17-18.] Until 2010 or 2011, everyone in

the Maintenance Department reported directly to Mr. Grass, and after that everyone in the

Maintenance Department reported at least indirectly to Mr. Grass with the exception of one employee who cleaned vans and reported to the executive secretary. [Filing No. 40-1 at 20.]

Mr. Grass distributed work orders to the employees he supervised, and worked with the leads under his direction to prioritize the maintenance jobs to be completed. [Filing No. 40-1 at 117; Filing No. 40-1 at 140.] Mr. Grass would pass out work orders in the morning and the Maintenance Department employees would complete jobs independently, calling him for technical support or on-site assistance if they were unable to complete the job. [Filing No. 44-1 at 3.] Mr. Grass was not able to supervise the Maintenance Department employees because of his work load. [Filing No. 44-1 at 3.]

Mr. Grass also reviewed the time cards of the employees he supervised, including approving overtime, and reviewed and approved all staff requests for personal time off. [Filing No. 40-1 at 33-35.] Mr. Grass also communicated with Human Resources regarding the Maintenance Department staff's benefits, job titles and descriptions, promotions, overtime, and hiring. [Filing No. 40-6 at 3.]

### b. Management of Work Load

Maintenance Department workers regularly worked outside their regular shift because of emergency needs, and Mr. Grass had the authority to schedule employees for overtime needs without Mr. Vandivier's approval and did so regularly. [Filing No. 40-1 at 75-77; Filing No. 40-3 at 4-5.] Mr. Grass also had the authority to call outside vendors to handle after-hours needs, [Filing No. 40-1 at 75-76], although he needed to get final approval from Mr. Vandivier for all jobs that were bid to outside contractors, [Filing No. 44-1 at 2]. Damar had a list of outside contractors and vendors, and Mr. Grass procured four of them. [Filing No. 44-2 at 14-15.]

Mr. Grass spent 30-35% of his time performing managerial duties. [Filing No. 40-1 at 111.] The non-managerial work Mr. Grass performed ranged from fixing a clogged toilet, broken window, kitchen equipment, or the heating and air dehumidification system in the swimming pool building, mowing grass, picking up trash, weeding, and vehicle repair and maintenance. [Filing No. 40-1 at 66-67; Filing No. 40-1 at 123.] Mr. Grass also was the primary snow plow truck driver, and performed approximately 70-80% of all plowing which required a snow plow truck. [Filing No. 44-1 at 3.]

All Maintenance Department employees were regularly scheduled for overtime work, but on many occasions the scheduled overtime employee did not have the skills needed to fix the problem. [Filing No. 44-1 at 2.] When that occurred, the overtime employee would forward the repair call to Mr. Grass. [Filing No. 44-1 at 2.] For example, Mr. Grass felt that he was the only one that was capable of repairing equipment in Damar's main kitchen because Damar did not have a certified technician and could not afford one who could work on that equipment. [Filing No. 40-1 at 66.] He also stated that he was "the only guy in the state of Indiana that actually knows how to work on" the heating and air dehumidification system in the swimming pool building. [Filing No. 40-1 at 66-67.] To service appliances which contained a certain refrigerant, the repairperson had to be certified by the Environmental Protection Agency, and during his employment with Damar Mr. Grass was the only employee who held that certification. [Filing No. 44-1 at 2.] Accordingly, Mr. Grass was the only Damar employee who was authorized to work on all of the air conditioners, refrigerators, and freezers throughout Damar's facilities. [Filing No. 44-1 at 2.] Additionally, Damar had a fleet of approximately eighty vehicles which had air conditioning units that required service from a person with that appropriate certification. [Filing No. 44-1 at 2.] While Mr. Grass had the authority to call in outside contractors to per-

form repairs, on many occasions he would do the work himself because of the lateness of the hour or because it was less costly and more efficient for him to do it himself. [Filing No. 44-1 at 2.] Mr. Grass believed that "the staff was not competent or sufficiently skilled to perform many of the overtime repairs," and that he "was better situated than [Mr.] Vandivier to be able to judge the skill level and competence of the staff" because he worked with them on a daily basis. [Filing No. 44-1 at 2.]

Mr. Vandivier "did not hire [Mr.] Grass to be a maintenance worker[; he] hired him to grow, train, and manage the maintenance staff and its work to meet Damar's rapid expansion. It was [Mr.] Grass' leadership, training, and management skills, not his technical abilities, that made him invaluable to Damar for the Maintenance Department's daily operations." [Filing No. 40-3 at 5.] However, Mr. Grass stated that "it became clear early-on that there was not enough time in the day and resources in the budget to fulfill Damar's expectations, [and his] skills were needed to repair, fix and maintain Damar's equipment in good and useable conditions." [Filing No. 44-1 at 3.] Mr. Grass also stated that, aside from a lack of skills, Damar did not have enough Maintenance Department employees to complete the volume of work that needed to be done. [Filing No. 44-1 at 3.] Mr. Grass informed Mr. Vandivier of this, and requested that Mr. Vandivier authorize additional personnel so Mr. Grass would not have to do so much of the work himself. [Filing No. 44-1 at 3.] Mr. Vandivier denied that request because there was not enough money in the budget to hire additional employees. [Filing No. 44-1 at 3.]

Mr. Grass was expected to be available for emergency situations, but had the authority to assign others to do the work and to be on call in place of him and was not expected to do the work himself. [Filing No. 40-1 at 75-77; Filing No. 40-3 at 4-5.] Mr. Grass did not implement a formal on-call system to direct calls to his staff until November 2010. [Filing No. 40-3 at 6.]

This occurred after Mr. Grass took a vacation beginning on October 14, 2010. [Filing No. 40-3 at 6.] He sent an email to Damar staff that morning instructing them to call Mr. Vandivier with emergency requests during normal business hours while he was on vacation, but advising them to continue to call him after normal business hours and on weekends and he would dispatch someone. [Filing No. 40-3 at 6; Filing No. 40-3 at 15.] When Mr. Grass returned from vacation, he asked for additional pay for working on vacation. [Filing No. 40-3 at 6.] Mr. Vandivier and Richard Harcourt, Damar's Senior Vice-President and Chief Financial Officer, met with Mr. Grass to discuss the issue and told him he "must establish an on-call system for one of his staff to be on call every week to take emergency and/or after hour/weekend calls." [Filing No. 40-3 at 6.] Mr. Grass sent an email to Damar employees on November 8, 2010 stating:

> Beginning today for after hours and weekend maintenance emergencies, please call…an on-call phone that will be passed weekly between all service technicians. I will still have my phone…please do not call my number unless the other phone is not available….The reason for the change is after 12 plus years of service, I am not going to be the first person contacted in case of emergency. Please be patient as we are trying this new system.

[Filing No. 40-3 at 6; Filing No. 40-3 at 21.]

Mr. Grass' Performance Appraisals do not reflect that Mr. Vandivier instructed Mr. Grass not to perform maintenance work, or disciplined him for working too many hours or for performing too many technical duties, and show that Mr. Vandivier continuously gave Mr. Grass exceptional performance reviews. [Filing No. 44-3.]

### c. Other Managerial Duties

#### i. Hiring

Mr. Grass interviewed applicants and made hiring recommendations to Mr. Vandivier and the Human Resources Department. [Filing No. 40-1 at 38-39.] He did not have the authority to hire applicants, [Filing No. 40-1 at 38-39], but Damar followed the Maintenance Depart-

ment's recommendations unless the candidate did not pass a background check (which included a drug test), [Filing No. 40-4 at 4].

### ii. *Promotions and Pay Changes*

Mr. Grass recommended staffing changes, pay increases, and promotions for the employees he supervised. [Filing No. 40-2 at 21-28.] Mr. Vandivier would routinely approve Mr. Grass' recommendations for pay increases. [Filing No. 40-3 at 7.] The Human Resources Department approved the Maintenance Department's recommendations for pay increases and promotions as long as they were within Damar's guidelines. [Filing No. 40-4 at 4.]

### iii. *Employee Evaluations*

Mr. Grass completed Annual Performance Appraisals for the Maintenance Department employees directly below him. [Filing No. 40-1 at 50-51.] Before the Maintenance Department had four leads reporting to Mr. Grass, he would evaluate every Maintenance Department employee and complete the evaluation forms then forward the forms to Mr. Vandivier. [Filing No. 40-1 at 137.] He continued to review and approve performance reviews for Maintenance Department employees until the end of his employment at Damar. [Filing No. 40-3 at 7; Filing No. 40-4 at 3; Filing No. 40-4 at 26-79.] Mr. Vandivier would also sign off on Annual Performance Appraisals Mr. Grass prepared and send them on to the Human Resources Department. [Filing No. 40-3 at 7.]

### iv. *Discipline*

Mr. Grass had the authority to recommend discipline for employees who were not able to perform their duties. [Filing No. 40-1 at 74-75; Filing No. 40-1 at 80-81.] Mr. Grass also had the authority to recommend firing employees he oversaw, but those recommendations had to be

approved by Mr. Vandivier and the Human Resources Department. [Filing No. 40-2 at 23-25; Filing No. 40-2 at 44-45.]

          *v.*     *Vendors and Contractors*

As part of his job duties, Mr. Grass also solicited bids from, and oversaw the work of vendors and contractors. [Filing No. 40-1 at 51-52.]

        *5.*  *Hours and Salary*

Mr. Grass' regular hours during his entire time at Damar were 7:00 a.m. to 3:30 p.m. Monday through Friday. [Filing No. 40-1 at 31.] He recorded his hours worked by filling out a blue time card at the end of each two-week period, which had a 20, 40, 60, or 80 across the bottom and circling the one that represented the number of hours worked. [Filing No. 40-1 at 31-32; Filing No. 40-5.] If his time did not fall within one of those choices, he would sometimes write additional time periods in. [Filing No. 40-1 at 32.] The employees Mr. Grass oversaw recorded their time by electronic clock, punching in when they arrived and out when they left. [Filing No. 40-1 at 32.]

For the last three years of his employment, with the exception of the first pay period in that three-year period, Mr. Grass received a bi-weekly salary of $2,291.20. [Filing No. 40-1 at 30-31; Filing No. 40-4 at 2; Filing No. 40-4 at 7-24.] For the first pay period, Mr. Grass was paid at his former bi-weekly salary of $2,246.40. [Filing No. 40-4 at 2; Filing No. 40-4 at 11.] During that three-year period, Mr. Grass never received less than his bi-weekly salary, and Damar did not deduct from Mr. Grass' salary for time off work or for any reason. [Filing No. 40-4 at 7-24.]

### 6. Termination of Mr. Grass' Employment

In December 2012, Damar placed Mr. Grass on administrative leave "after receiving credible reports that he falsified the time records of one of his direct reports." [Filing No. 40-4 at 4.] After presenting Mr. Grass with the conclusions of Damar's investigation into the reports, Mr. Grass chose to resign on December 21, 2012. [Filing No. 40-4 at 4.]

### 7. The Lawsuit

Mr. Grass filed this lawsuit on February 25, 2013. [Filing No. 1.] He alleges claims for violations of the FLSA (Counts I and II); violation of the IWPA, I.C. § 22-2-2-4 (Count III); and violation of the IWCA, I.C. § 22-2-9-2 (Count IV). [Filing No. 1 at 5-6.]

### III.
### DISCUSSION

## A. FLSA Claims

The disagreement between Mr. Grass and Damar in this case is simple: Damar argues that Mr. Grass was an exempt executive so was not entitled to overtime under the terms of the FLSA, while Mr. Grass claims he was a non-exempt employee and is owed overtime under the FLSA.

In evaluating an FLSA claim, the Court must conduct a "thorough, fact-intensive analysis of the employee's employment duties and responsibilities." *Schaefer-LaRose v. Eli Lilly & Co.,* *679 F.3d 560, 572 (7th Cir. 2012).* "The burden is on the employer to prove that an employee is exempt under FLSA,…and such exemptions are to be narrowly construed against the employer seeking the exemption." *Schmidt v. Eagle Waste & Recycling, Inc.,* *599 F.3d 626, 631 (7th Cir. 2010)* (citing *Piscione v. Ernst & Young LLP,* *171 F.3d 527, 533 (7th Cir. 1999)* and *Yi v. Sterling Collision Centers, Inc.,* *480 F.3d 505 (7th Cir. 2007)*); *see also* *Corning Glass Works v. Brennan,* *417 U.S. 188, 196-97, 94 S.Ct. 2223, 2229, 41 L.Ed.2d 1 (1974).* Exemptions to the

FLSA "are narrowly construed by the courts,…and are applied only where it 'plainly and unmistakably comes within the statute's terms and spirit' to deny the employee overtime." *Jackson v. Go-Tane Servs.*, 56 Fed. Appx. 267, 270 (7th Cir. 2003) (citing *Mitchell v. Lublin, McGaughy & Assoc.*, 358 U.S. 207, 211 (1959) and quoting *Arnold v. Ben Kanowsky Inc.*, 361 U.S. 388, 390 (1960)).

The FLSA requires that employers compensate employees who work over forty hours per workweek "at a rate not less than one and one-half times the regular rate at which he is employed." 29 U.S.C. § 207(a)(1). The overtime provision does not apply, however, where the employee is "employed in a bona fide executive…capacity…." 29 U.S.C. § 213(a)(1). 29 C.F.R. 541.100(a) provides the standard for determining whether an employee is employed in a bona fide executive capacity, and states:

> The term "employee employed in a bona fide executive capacity" in section 13(a)(1) of the Act shall mean any employee:
>
> (1) Compensated on a salary basis at a rate of not less than $455 per week…, exclusive of board, lodging or other facilities;
>
> (2) Whose primary duty is management of the enterprise in which the employee is employed or of a customarily recognized department or subdivision thereof;
>
> (3) Who customarily and regularly directs the work of two or more other employees; and
>
> (4) Who has the authority to hire or fire other employees or whose suggestions and recommendations as to the hiring, firing, advancement, promotion or any other change of status of other employees are given particular weight.

29 C.F.R. § 541.100(a).

Mr. Grass does not address the third or fourth factors in his response to Damar's Motion for Summary Judgment, focusing only on the compensation and primary duty requirements of § 541.100. [*See* Filing No. 45.] Accordingly, any arguments that he would not be considered an

exempt employee under the third and fourth factors are considered waived by Mr. Grass. *See Bonte v. U.S. Bank, N.A.*, 624 F.3d 461, 466 (7th Cir. 2010) ("Failure to respond to an argument – as [Mr. Grass] has done here – results in waiver"); *Goodpaster v. City of Indianapolis*, 736 F.3d 1060, 1075 (7th Cir. 2013) (affirming the district court's dismissal of three claims as waived because the party "failed to present evidence or argument in favor of them," and stating "[t]hey also failed to respond to the City's arguments against these claims in their reply to the City's motion to dismiss. Because they did not provide the district court with any basis to decide their claims, and did not respond to the City's arguments, these claims are waived").

The Court will address the first and second factors set forth in 29 C.F.R. § 541.100(a) in turn.

### 1. Compensation

29 C.F.R. § 541.100(a)(1) provides that, in order for an employee to be categorized as a bona fide executive, he must have been "[c]ompensated on a salary basis at a rate of not less than $455 per week…, exclusive of board, lodging or other facilities." Damar argues that "except for the first pay period, [Mr. Grass] was paid a bi-weekly salary nearly three times the required amount for the entire three-year time period prior to the end of his employment," that he "never received less than his weekly salary," and that "Damar never deducted from [his] salary for time off work or any other reason." [Filing No. 39 at 15 (emphasis omitted).] Mr. Grass responds by arguing that he was not paid on a salary basis because he was required to fill out time-off sheets when he missed partial days of work and that although no deductions to his pay were made, he always had a balance of paid time off ("PTO") hours so cannot determine whether Damar would have deducted pay for missing partial days of work if he had not had a balance of PTO hours. [Filing No. 45 at 15.] Damar replies that it "has never deducted for partial-day absences for any

exempt employee, including [Mr.] Grass, and its procedure does not permit it to do so." [Filing No. 47 at 5.]

> An employee is considered to be paid on a "salary basis" when:
>
> [T]he employee regularly receives each pay period on a weekly, or less frequent basis, a predetermined amount constituting all or part of the employee's compensation, which amount is not subject to reduction because of variations in the quality or quantity of the work performed.  Subject to [certain] exceptions…, an exempt employee must receive the full salary for any week in which the employee performs any work without regard to the number of days or hours worked.  Exempt employees need not be paid for any workweek in which they perform no work.  An employee is not paid on a salary basis if deductions from the employee's predetermined compensation are made for absences occasioned by the employer or by the operating requirements of the business.  If the employee is ready, willing and able to work, deductions may not be made for time when work is not available.

29 C.F.R. § 541.602.[1]

Mr. Grass was paid more than the minimum of $455 per week to be considered an executive employee.  29 C.F.R. § 541.100(a)(1).  But Mr. Grass argues that he was required to fill out a time-off sheet, and that it was his understanding that Damar would subtract from his pay for missing partial days of work.  He acknowledges, however, that he does not know if that was the case because he always had a balance of PTO hours to make up for partial days missed.

First, the Court notes that an employer is permitted to require salaried employees to track their time, and that requiring such tracking does not indicate that the employee was not, in fact, salaried.  *See Demos v. City of Indianapolis*, 126 F.Supp.2d 548, 555 (S.D. Ind. 2000) ("Time-

---

[1] "The Department of Labor's regulations interpreting the [FLSA] are 'entitled to considerable weight in construing the Act.'"  *Joles v. Johnson County Youth Service Bureau, Inc.*, 885 F.Supp. 1169, 1174 (S.D. Ind. 1995) (quoting *Tony and Susan Alamo Foundation v. Secretary of Labor*, 471 U.S. 290, 297 (1985)).  *See also Solis v. SCA Restaurant Corp.*, 938 F.Supp.2d 380, 396 (E.D. N.Y. 2013) ("The regulations that are promulgated by the Secretary of Labor pursuant to an express grant of authority from Congress under the FLSA have the force and effect of law. They are to be given controlling weight unless they are found to be arbitrary, capricious, or manifestly contrary to the statute").

- 17 -

keeping alone does not show that…employees were non-exempt….[T]here may be myriad reasons to require employees to record their work time").

Second, the Court rejects Mr. Grass' argument that, because he always had a balance of PTO hours, it is possible Damar would have deducted pay for missing partial days of work if he had not had such a balance. 29 C.F.R. § 541.602(a) provides that an employee is paid on a salary basis if the employee's compensation "is not subject to reduction because of variations in the quality or quantity of the work performed." The Seventh Circuit Court of Appeals has instructed that "[t]he phrase 'subject to' does not require proof that an employer has reduced an employee's wages; 'an employment policy that creates a 'significant likelihood' of [a] deduction' will suffice." *Kennedy v. Commonwealth Edison Co.*, 410 F.3d 365, 371 (7th Cir. 2005) (quoting *Auer v. Robbins*, 519 U.S. 452, 461, 117 S.Ct. 905, 137 L.Ed.2d 79 (1997))[2]; *see also Klein v. Rush-Prebyterian-St. Luke's Med. Ctr.*, 990 F.2d 279, 286 (7th Cir. 1993) ("'Subject to reduction' does not mean that a reduction was actually made. The plain meaning of the language suggests that it is enough that a deduction could have been made for an impermissible reason").[3]

_____

[2] Significantly, even if Damar had made some deductions, those deductions would not necessarily cause it to lose the executive exemption. *See* 29 C.F.R. § 541.603 (court should consider as one factor "the number of improper deductions, particularly as compared to the number of employee infractions warranting discipline" when determining whether an employer had an "actual practice of improper deductions," and "[i]mproper deductions that are either isolated or inadvertent will not result in loss of the exemption for any employees subject to such improper deductions, if the employer reimburses the employees for such improper deductions." Additionally, nothing in the regulations regarding improper deductions is to "be construed in an unduly technical manner so as to defeat the exemption").

[3] Damar argues that an "actual practices test" should apply in determining whether time was deducted from salaried employees' compensation, and cites a case from the Sixth Circuit. [*See* Filing No. 47 at 4 (citing *Baden-Winterwood v. Life Time Fitness, Inc.*, 566 F.3d 618, 627-28 (6th Cir. 2009)).] But this Court is bound by Seventh Circuit precedent, and Damar has not cited any Seventh Circuit cases which conflict with the test set forth in *Kennedy*, 410 F.3d 365, and applied herein.

Fatal to Mr. Grass' argument is the fact that he has not cited any evidence indicating that Damar had a policy of deducting amounts from salaried employees' wages for partial days missed. Instead, his argument is based only on his "understanding that if his PTO were exhausted, he would have been deducted in pay by his hourly rate for partial day absences." [Filing No. 45 at 10.] Mr. Grass does not cite to any evidence supporting his "understanding." Conversely, Damar has submitted the Supplemental Affidavit of Elizabeth Snyder, Vice-President of Human Resources. [Filing No. 46-1.] Ms. Snyder states that "Damar does not have a policy, procedure, or practice that would permit deductions from exempt employees' pay for absences of less than a full day if an exempt employee has no available PTO," and "Damar has not deducted from any exempt employee's pay for less than a full-day absence even if the exempt employee did not have any available PTO." [Filing No. 46-1 at 3.] While Mr. Grass filed a surreply to address the Snyder Supplemental Affidavit, he did not challenge her statements regarding Damar's policy or practice of not deducting from an exempt employee's pay, nor did he present any evidence to contradict those statements. [Filing No. 49.]

Accordingly, because Mr. Grass was paid over $455 per week and he has not presented any evidence that he was subject to a policy of Damar to make deductions from his pay for partial days missed, the Court finds that Mr. Grass was paid on a salary basis for purposes of the FLSA's executive exemption.

### 2. *Primary Duty*

The second factor set forth in 29 C.F.R. § 541.100(a) requires that a bona fide executive have as his primary duty the "management of the enterprise in which the employee is employed or of a customarily recognized department or subdivision thereof." Damar argues that Mr. Grass' primary duty was managing the Maintenance Department, that his exempt duties were

substantially more important than his non-exempt duties, that the amount of time Mr. Grass performed exempt work is not determinative, that he was essentially free from direct supervision, and that his hourly rate was substantially higher than the highest paid and skilled Maintenance Department employee.  [Filing No. 39 at 16-26.]

Mr. Grass responds that his primary duty was not management, but rather he spent the majority of his time performing technical non-exempt work, that the non-exempt work he performed was just as important as his managerial work, that he had similar relative freedom from supervision that non-exempt employees had, and that his hourly rate was similar to one of the non-exempt technicians.  [Filing No. 45 at 15-22.]

On reply, Damar argues that Mr. Grass relied on a case in his response that was based on the Department of Labor's pre-2004 FLSA regulations (which, it argues, are significantly different than the regulation at issue here).  Damar also argues that the technician to which Mr. Grass compared his hourly wage did not perform work similar to the work Mr. Grass performed.  [Filing No. 47 at 5-18.]

In his surreply, Mr. Grass argues that he performed similar work to the comparator technician, that Damar itself argued in its opening brief that they performed similar work, and that the analysis from the case it discussed in its response still applies even though the case was from before the FLSA was amended.

29 C.F.R. § 541.700 discusses the meaning of "primary duty" in § 541.100(a)(2):

> To qualify for exemption…an employee's "primary duty" must be the performance of exempt work.  The term "primary duty" means the principal, main, major or most important duty that the employee performs.  Determination of an employee's primary duty must be based on all the facts in a particular case, with the major emphasis on the character of the employee's job as a whole.  Factors to consider when determining the primary duty of an employee include, but are not limited to, the relative importance of the exempt duties as compared with other types of duties; the amount of time spent performing exempt work; the employ-

ee's relative freedom from direct supervision; and the relationship between the employee's salary and the wages paid to other employees for the kind of nonexempt work performed by the employee.

Notably, the parties agree that Mr. Grass spent more time performing non-exempt duties than he did performing managerial duties. [*See, e.g.*, Filing No. 47 at 14 ("Damar does not dispute that [Mr. Grass] spent the majority of time performing non-exempt duties"); Filing No. 40-1 at 111 (Mr. Grass testified that he spent 65-70% of his time performing non-exempt duties).] While the time spent performing non-exempt versus managerial duties is one factor to consider, it is not determinative. *See* 29 C.F.R. § 541.700(b) ("The amount of time spent performing exempt work can be a useful guide in determining whether exempt work is the primary duty of an employee….Time alone, however, is not the sole test, and nothing in this section requires that exempt employees spend more than 50 percent of their time performing exempt work. Employees who do not spend more than 50 percent of their time performing exempt duties may nonetheless meet the primary duty requirement if the other factors support such a conclusion"). Accordingly, the Court turns to the three remaining factors – the relative importance of Mr. Grass' exempt duties as compared to his managerial duties, his relative freedom from direct supervision, and the relationship between his salary and the wages paid to other employees for the same kind of non-exempt work.

### a. Relative Importance of Exempt Duties

The first factor the Court will consider in determining whether Mr. Grass' management duties were "primary" is the relative importance of those management duties as compared to the non-exempt, maintenance duties he performed. Damar argues that Mr. Grass' management duties were "far more important than his non-managerial ones in achieving Damar's overall successful operations," the non-managerial work he performed could have been performed by oth-

ers, and his managerial duties were significant. [Filing No. 39 at 18-20.] Mr. Grass responds that "[t]he technical hands-on work [he] performed was at the same or similar level of importance as the…work [that] the other non-exempt employees were performing," and that "if he were not available 24/7 to perform them, clients could be put in physical danger." [Filing No. 45 at 20.] Damar replies by reiterating that other employees could have performed the non-exempt duties Mr. Grass performed, including several Maintenance Department employees that Mr. Grass had reported were capable of performing "all levels of maintenance and repair on all related equipment, including, but not limited to, HVAC equipment, major appliances, fire systems, electrical and plumbing." [Filing No. 47 at 11.] Damar also notes that if Mr. Grass felt the Maintenance Department employees were not able to perform their job duties, he could have coached or disciplined them. [Filing No. 47 at 12.]

Mr. Grass spends a great deal of time in his briefs discussing how much non-exempt work he performed and detailing that type of work. But, as noted above, the parties agree that Mr. Grass performed more non-exempt work than managerial work – indeed, about twice as much. [*See* Filing No. 40-1 at 111 (Mr. Grass testified that he spent 65-70% of his time performing non-exempt work).] Mr. Grass' only arguments regarding the relative importance of the non-exempt work are: (1) that other Maintenance Department employees could not perform many of the maintenance tasks he completed (*e.g.*, servicing appliances which contained a certain refrigerant that only he was certified to handle, [Filing No. 44-1 at 2]); and (2) that guests may have been in physical danger if he had not performed many of the non-exempt tasks he completed, [Filing No. 45 at 20].

Mr. Grass' first argument highlights the fact-specific nature of the issues before the Court. For example, Damar presented evidence that Mr. Grass himself considered other Mainte-

nance Department employees to be capable of "all" repairs on HVAC equipment, major appliances, fire systems, electrical, and plumbing. [*See, e.g.*, Filing No. 44-1 at 5 (Mr. Grass wrote in a memo to Mr. Vandivier and Mr. Harcourt that Mikhail Malyonanny "[p]erforms all levels of maintenance and repair on all related equ[i]pment, including, but not limited to HVAC equipment, all major appliances, fire systems, electrical and plumbing," and provided the same information for other Maintenance Department employees as well).] However, Mr. Grass also stated that he was the only employee capable of performing certain repairs on the heating and air dehumidification system in the swimming pool building. [Filing No. 40-1 at 66-67.] From the evidence presented, it is not clear to the Court whether other employees could have performed the air dehumidification system repairs, or the repairs on certain appliances which Damar does not dispute required a special license that only Mr. Grass had.

Additionally, even if other employees could perform some or all of the repairs Mr. Grass performed, the Court cannot determine as a matter of law whether his non-exempt maintenance work was less important than his managerial work. For example, what would the effect on Damar's operations have been if Mr. Grass performed none of the maintenance work he typically performed? Indeed, Mr. Grass had requested that Damar hire more Maintenance Department employees so that he would not have to perform so much maintenance work himself. [Filing No. 44-1 at 3.] Based on the facts presented, the Court is unable to determine the relative importance of Mr. Grass' non-exempt work. *See Carlisle v. Dolgencorp, Inc.*, 2012 WL 1623039, *10 (S.D. Ind. 2012)* ("A reasonable jury could be convinced by [the employer's] argument that a leaderless store can not function and when this evidence is combined with evidence about [the employee's] freedom from supervision and her increased wages, could find that [the employee's] primary duty was management. However, a reasonable jury could also find that management is not

her primary duty because it was convinced that [the employer's] low price business model renders [the employee's] manual labor most important….Because a reasonable jury could find that [the employee's] primary duty was not management, [the employer] is not entitled to summary judgment").[4]

Accordingly, the Court is unable to find as a matter of law that Mr. Grass' managerial tasks were his "primary duty."  *See Maestas v. Day & Zimmerman, LLC*, 664 F.3d 822, 827 (10th Cir. 2012) (denying employer's motion for summary judgment relating to FLSA's administrative, executive, or combination exemptions because "the primary duty determination is a factual one," reserved for the finder of fact); *Dep't of Labor v. City of Sapulpa, Okl.*, 30 F.3d 1285, 1287 (10th Cir. 1994) ("A fact-sensitive inquiry is necessary" to determine which duty is primary); *Shockley v. City of Newport News*, 997 F.2d 18, 26 (4th Cir. 1993) ("[T]he amount of time devoted to managerial duties, and the significance of those duties, present factual questions….").  Determination of the primary duty issue is critical to resolving whether Mr. Grass is an exempt employee, and involves resolving factual disputes and making value judgments – a prohibited practice for a court at the summary judgment stage, and one to be performed by the jury at trial.

---

[4] As Damar has argued, *Carlisle* was decided under the pre-2004 version of the FLSA.  2012 WL 1623039 at *6 ("As all workweeks at issue occurred prior to [the effective amendment date], the preamendment regulations are applicable to [plaintiff's] claims").  The preamendment factors to consider in determining primary duty, however, are the same as those which currently apply, except under the preamendment test courts also considered "the frequency with which the employee exercises discretionary powers."  2012 WL 1623039 at *7.  *Carlisle* is still relevant to a discussion of the relative importance of the employee's managerial duties, and the fact-specific nature of that inquiry.

Put simply, the Court cannot find as a matter of law, based on the evidence before it, that Mr. Grass falls within the FLSA's executive exception. Accordingly, Damar is not entitled to summary judgment on Mr. Grass' FLSA claims (Counts I and II). [5]

### B. Indiana Wage Claims Act Claim

At the outset, the Court notes that Mr. Grass alleges claims under both the IWPA and the IWCA. [Filing No. 1 at 5-6.] Through the course of convoluted briefing, however, Mr. Grass abandoned his IWPA claim, [*see* Filing No. 45 at 22 (stating that "[t]he Wage Payment Statute applies to current employees and former employees who have voluntarily left employment," that "[t]he Wage Claims Statute applies to former employees who have been separated from work by their employer," and that "[Mr.] Grass did not voluntarily leave his employment with…Damar").] Additionally, the parties agreed that the IWCA is the proper statute under which Mr. Grass' claim falls because he did not leave employment with Damar under his own terms, [*see* Filing No. 52 at 1 ("Damar's primary concern is ensuring the Court's awareness that it does not dispute the applicability of the Wage Claims Statute to Plaintiff's theory of recov-

---

[5] The Court also notes factual disputes regarding Mr. Grass' salary compared to the wages paid to other employees for similar kinds of non-exempt work. While Damar argues that Mr. Grass' effective hourly rate was "substantially higher than the highest paid, highly skilled Maintenance employee, Mike Smith…," [Filing No. 39 at 25], Mr. Grass argues that his effective hourly rate when considering that he actually worked an average of sixty hours a week was less than Mr. Smith's hourly wage, [Filing No. 45 at 21]. Damar replies that Mr. Smith was paid a higher hourly wage "because of his exceptional expertise and skill in woodworking and building and construction, as well as his unrivaled familiarity with the use of those skills [from] his prior work with a contractor serving Damar," [Filing No. 47 at 16], but Mr. Grass submits an affidavit on surreply stating that he and Mr. Smith worked on numerous woodworking projects together, [Filing No. 50-1 at 1]. This is yet another factor that can only be determined by weighing disputed facts, which the Court cannot do at the summary judgment stage.

ery").[6]  Damar is entitled to summary judgment on Mr. Grass' abandoned IWPA claim (Count III), and the Court will now consider the viability of his IWCA claim.

Damar argues that it is entitled to summary judgment on Mr. Grass' claim under the IWCA because Mr. Grass has not administratively exhausted his claim with the Indiana Department of Labor.  [Filing No. 47 at 3.]  Mr. Grass argues that he need not exhaust administrative remedies because the Department of Labor "is authorized to take assignment of wage claims of less than $6,000," and his claim "far exceeds $6,000."  [Filing No. 51 at 3 (emphasis omitted).]  Damar argues that the $6,000 threshold only applies to the assignment of a wage claim, and not to the requirement that a claimant administratively exhaust such claims.  [Filing No. 52 at 2.]

Under clear Indiana law, Mr. Grass must first exhaust his administrative remedies with the Department of Labor before filing a suit against Damar for violation of the IWCA.  *See Hollis v. Defender Sec. Co.*, 941 N.E.2d 536, 540 (Ind. App. 2011) ("[employee] was involuntarily separated from [employer] when he filed his claims and, as such, his claims fell under the Wage Claims Statute.  Instead of submitting his claims to the [Department of Labor], as required by [the] Wage Claims Statute, [employee] improperly filed a complaint based on the Wage Payment Statute.  Because [employee] did not allege any Wage Claims Statute violations and submit his claims to the [Department of Labor], the trial court properly dismissed [his] claims"); *Quimby v.*

---

[6] More specifically, Damar filed a Motion for Leave to Amend Defendant's Reply to Plaintiff's Response in Opposition to Defendant's Motion for Summary Judgment, [Filing No. 48], in which it seeks to amend its argument on reply by conceding that Mr. Grass can properly bring a claim under the IWCA because he did not "leave [his] job on [his] own terms."  [*See* Filing No. 48-1 at 4 (discussing *Walczak v. Labor Works-Fort Wayne LLC*, 983 N.E.2d 1146, 1154 (Ind. 2013))*.*]  Because Damar argued alternatively in its original Reply that even if Mr. Grass' claim is properly brought under the IWCA, it is barred for failure to exhaust administrative remedies, the Court does not find it necessary for Damar to amend its reply in order to concede its original argument – that the IWCA does not apply to Mr. Grass' claims.  Accordingly, the Court denies Damar's Motion for Leave to Amend Defendant's Reply to Plaintiffs' Response in Opposition to Defendant's Motion for Summary Judgment.  [Filing No. 48.]

*Becovic Management Group, Inc.*, 962 N.E.2d 1199, 1200 (Ind. 2012) ("It is also well settled that an employee who has a claim under the Wage Claims Statute must first exhaust an administrative remedy with the [Department of Labor] before filing a lawsuit") (citing I.C. § 22-2-9-4); *St. Vincent Hosp. & Health Care Ctr., Inc. v. Steele*, 766 N.E.2d 699, 705 (Ind. 2002) (claimants under IWCA must first submit claims to Department of Labor).[7]

Mr. Grass has not presented any evidence that he has exhausted his administrative remedies with the Department of Labor. Accordingly, Damar is entitled to summary judgment on his IWCA claim (Count IV).

## IV.
### CONCLUSION

For the foregoing reasons, the Court **DENIES IN PART** Damar's Motion for Summary Judgment, [Filing No. 38], to the extent that it cannot conclude as a matter of law that Mr. Grass is an exempt executive under the terms of the FLSA since a triable issue exists regarding whether Mr. Grass' primary duty was management for purposes of 29 C.F.R. § 541.100(a)(2). Therefore, Damar's Motion for Summary Judgment on Mr. Grass' FLSA claims (Counts I and II) is **DENIED**, and those claims will proceed.

As to Counts I and II, the Court finds pursuant to Fed. R. Civ. P. 56(g)[8] that the following

---

[7] Mr. Grass cites I.C. § 22-2-9-5(a) to support his argument that he need not exhaust his administrative remedies because his IWCA claim is worth more than $6,000. [Filing No. 51 at 3.] But Damar is correct that § 22-2-9-5(a) only applies to the types of claims that the Commissioner of Labor can take assignment of, and not to a claimant's obligation to administratively exhaust remedies before suing.

[8] Fed. R. Civ. P. 56(g) states that "[i]f the court does not grant all the relief requested by the motion, it may enter an order stating any material fact – including an item of damages or other relief – that is not genuinely in dispute and treating the fact as established in the case."

facts are established:

(1) Mr. Grass was compensated on a salary basis at a rate of not less than $455 per week…, exclusive of board, lodging or other facilities, for purposes of 29 C.F.R. § 541.100(a)(1);

(2) Mr. Grass customarily and regularly directed the work of two or more employees, for purposes of 29 C.F.R. § 541.100(a)(3); and

(3) Mr. Grass' suggestions and recommendations as to the hiring, firing, advancement, promotion or any other change of status of other employees were given particular weight, for purposes of 29 C.F.R. § 541.100(a)(4).[9]

Additionally, the Court **GRANTS IN PART** Damar's Motion for Summary Judgment, [Filing No. 38], to the extent it **GRANTS** summary judgment in favor of Damar on Mr. Grass' IWPA claim (Count III) and his IWCA claim (Count IV). No partial judgment shall issue.

Finally, the Court **DENIES** Damar's Motion for Leave to Amend Defendant's Reply to Plaintiff's Response in Opposition to Defendant's Motion for Summary Judgment, [Filing No. 48]. The Court requests that the Magistrate Judge set a status conference in this matter in advance of the parties' upcoming pretrial deadlines.

**Distribution via ECF only to all counsel of record**

---

[9] As discussed above, Mr. Grass did not address the Court's second and third findings, and the Court held that he has waived any arguments relating to those findings. *See also Johnson*, 325 F.3d at 901 (summary judgment "is the 'put up or shut up' moment in a lawsuit, when a party must show what evidence it has that would convince a trier of fact to accept its version of events").